Filed 12/11/13

**<u>CERTIFIED FOR PUBLICATION</u>**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SAN PABLO BAY PIPELINE CO. LLC et al., <br><br> Petitioners, <br><br> v. <br><br> CALIFORNIA PUBLIC UTILITIES COMMISSION, <br><br> Respondent; <br><br> TESORO REFINING & MARKETING CO. et al., <br><br> Real Parties in Interest. | F064501 <br><br><br><br> **OPINION** |

ORIGINAL PROCEEDINGS; petition for writ of review of decision of the Public Utilities Commission of the State of California.

Goodin, Macbride, Squeri, Day & Lamprey, James D. Squeri; Munger, Tolles & Olson, Fred A. Rowley, Jr. and L. Ashley Aull for Petitioners.

Frank R. Lindh, Helen W. Yee and Paul Angelopulo for Respondent.

Manatt, Phelps & Phillips, David L. Huard, Tara S. Kaushik, Benjamin G. Shatz; Orrick, Herrington & Sutcliffe, Joseph M. Malkin; Pillsbury Winthrop Shaw Pittman, Kevin M. Fong, Michael S. Hindus and Wesley M. Spowhn for Real Parties in Interest.

Subsidiaries of Shell Petroleum Inc. that own and operate a crude oil pipeline filed this original writ proceeding to challenge a decision by the California Public Utilities Commission (the Commission or PUC) concerning the refund of a portion of the fees the subsidiaries collected from Chevron, Tesoro and Valero for transporting oil through the pipeline. The issue before this court is whether the Commission erroneously included privately owned truck racks and storage tanks in the pipeline assets subject to regulation as a public utility.[1]

We conclude the Commission properly interpreted its earlier decision that held the Shell Petroleum subsidiaries had dedicated the pipeline to public use. That decision addressed the pipeline as a whole and did not include dedication findings on an asset-by-asset dedication basis and did not explicitly mention the truck racks and storage tanks. Nonetheless, the Commission's interpretation that those assets were covered by its dedication decision was consistent with the broad statutory definition of "pipe line" (Pub. Util. Code, § 227) and the axiom that the "greater contains the less" (Civ. Code, § 3536).

Therefore, the Commission's decisions are confirmed.

## FACTS

*The Parties*

The proceedings before this court began with a petition for writ of review filed by Shell subsidiaries San Pablo Pipeline Company, LLC (Pipeline Company) and its affiliate, Shell Trading (US) Company (Shell Trading). For purposes of this opinion, Pipeline Company and Shell Trading are collectively referred to as "petitioners."

---

[1] The initial petition also asserted that the Commission erroneously resolved issues involving the statute of limitations. On October 31, 2013, we granted the Commission's motion to dismiss the statute of limitations issues on the ground that its analysis of those issues had been vacated and, therefore, those issues were not yet ripe for consideration by this court.

The Commission is the sole respondent. It is the California administrative agency with the statutory authority to supervise and regulate public utilities and to do all things that are necessary and convenient in the exercise of that power and jurisdiction. (Pub. Util. Code, § 701.) The Commission issued the decisions challenged in this writ proceeding.

The three real parties in interest are (1) Chevron Products Company (Chevron); (2) Tesoro Refining and Marketing Company (Tesoro); and (3) Valero Marketing and Supply Company (Valero). Their "interest" is in recovering part of the money they paid to the Shell affiliates to have crude oil shipped by pipeline from Chevron's oil production fields near Bakersfield to refineries operated by Tesoro and Valero in the San Francisco Bay Area. The three real parties in interest are collectively referred to as "shippers" in this opinion.

*The Shell Group*

Royal Dutch Shell plc is the ultimate parent company of the entities comprising the Shell group, which includes the intermediary corporation Shell Petroleum Inc. and the petitioners Pipeline Company and Shell Trading.

Both petitioners, through the various layers of corporate organization, are subsidiaries of Shell Petroleum Inc. The intermediary entities between Shell Petroleum Inc. and Pipeline Company include Equilon Enterprises LLC, which does business as Shell Oil Products US (Shell Products). Shell Products is relevant because, when Chevron initiated proceedings before the Commission, Shell Products owned the pipeline that is the subject of this litigation. Currently, Shell Products is a parent company of the pipeline's present owner, Pipeline Company.

*The Pipeline*

The pipeline is a 265-mile 20-inch heated crude oil pipeline running from oil fields in Kern County to the San Francisco Bay Area (SJV Pipeline). The SJV Pipeline includes gathering systems that collect oil from production fields and connect into trunk lines. Trucks also deliver crude oil to the SJV Pipeline. For instance, San Ardo crude oil is brought to the Coalinga Station by truck, unloaded and then blended with the San Joaquin

3.

Valley heavy crude that is transported by the SJV Pipeline.  Similarly, the Bakersfield Tank Farm collects San Joaquin Valley heavy crude delivered by truck.[2]  The SJV Pipeline's facilities also include breakout and storage tanks, which are used to manage deliveries and maintain efficient levels of flow.

The SJV Pipeline transports crude oil to three refineries in the Bay Area: (1) the Shell refinery in Martinez, California; (2) the Tesoro Golden Eagle refinery in Martinez, California; and (3) and the Valero refinery in Benicia, California.  The fact that the SJV Pipeline is heated is important because San Joaquin Valley heavy crude is thick (i.e., has a high viscosity) and can be transported efficiently only in a heated pipeline.

The history of the SJV Pipeline began in the late 1950's or early 1960's when Tidewater Oil Company built it to transport crude oil from the Kern River area to Tidewater's refinery in the Bay Area.

Subsequently, the SJV Pipeline was acquired by Texaco, Inc.  In 1986, the State of California and the City of Long Beach filed a lawsuit in Los Angeles County that alleged that Texaco was operating the SJV Pipeline as a common carrier.  The basic thrust of the complaint was that buy-sell agreements used by Texaco were a sham designed to evade Commission regulation and that Texaco, by providing transportation services through the buy-sell agreements, had dedicated the SJV Pipeline to public use.[3]

---

[2]     Truck racks (one of the subjects of this proceeding) are part of the facilities used to unload the oil delivered to the SJV Pipeline by truck.

[3]     These allegations are essentially the same allegations made by the shippers in the proceedings initiated by Chevron in 2005.  Under the buy-sell agreements between Shell affiliates and the shippers, a subsidiary of Shell Products would (i) buy oil produced in Chevron's fields in Kern County, taking legal title and assuming the risk of loss, (ii) transport that oil through the pipeline to the Bay Area, and (iii) deliver the oil to Tesoro or Valero in the Bay Area for the pre-arranged sale price.

4.

In 1994, the Second Appellate District of the Court of Appeal issued an unpublished opinion in *State of California v. Chevron Corp*, holding that the SJV Pipeline was operated as a private enterprise and was not a common carrier subject to Commission regulation.

In 1998, ownership of the SJV Pipeline changed when Texaco and Shell Oil Company formed Equilon Enterprises LLC (i.e., Shell Products) as a joint venture. The joint venture's assets included the SJV Pipeline and a refinery in Martinez, California that Shell Oil Company contributed.

In 2001, Chevron wanted to acquire Texaco and sought regulatory approval of the acquisition. Chevron was permitted to retain Texaco's ownership rights of crude oil production in the San Joaquin Valley, but was not allowed to keep Texaco's interest in the SJV Pipeline. As a result, Texaco sold its interests in the pipeline to Shell Oil Company. As part of the sale, a contract was entered that required Shell Oil Company to purchase crude oil from Texaco at the production fields and sell crude oil to Texaco at a delivery point in the San Francisco Bay Area. Chevron, as Texaco's successor, obtained these contractual rights and used them to satisfy its obligations to deliver crude oil to refineries in the Bay Area.

**LEGAL PROCEEDINGS**

In December 2005, Chevron's dissatisfaction with the contractual arrangements under which it had access to the SJV Pipeline led Chevron to file a complaint with the Commission. Chevron asked the Commission to find the SJV Pipeline was a public utility and exercise jurisdiction. Chevron alleged that the Shell affiliates had manifested an unequivocal intention to dedicate the excess capacity of the SJV Pipeline to public service and the buy-sell agreements were a subterfuge to evade Commission jurisdiction. Chevron's request for relief sought (1) a determination of just and reasonable rates for transportation of crude oil in the SJV Pipeline and (2) an order directing the Shell affiliates to refund to Chevron the difference between the rates paid by Chevron from April 1, 2005, and the reasonable rates determined by the Commission.

Chevron also alleged that it was obligated contractually to deliver approximately 62,000 barrels of crude per day to Tesoro at the Golden Eagle refinery and approximately 4,000 barrels of crude per day to Valero at its Benicia refinery. Chevron fulfilled a portion of its delivery obligations, about 22,000 barrels per day, using the KLM Pipeline, an unheated common carrier pipeline owned and operated by Chevron.[4] Chevron alleged that the SJV Pipeline, which is heated, was the only practical way to transport the approximately 44,000 additional barrels per day of San Joaquin Valley heavy crude needed to meet its contractual obligations with Tesoro and Valero.

Later in December 2005, Tesoro filed a petition to intervene in the proceeding initiated earlier that month by Chevron.

In July 2007, the Commission issued Decision 07-07-040 and concluded that the SJV Pipeline had been dedicated to public service and, thus, was subject to regulation by the Commission.

In December 2007, the Commission ruled on the petitioners' application for rehearing by issuing Decision 07-12-021, which modified the prior decision. Among other things, the modification directed Shell Products and Shell Trading to file tariffs for its third party contracts.[5] The Commission's modified decision did not resolve Chevron's request for a refund of unreasonable charges paid since April 1, 2005, because the overcharges could not be calculated until a reasonable tariff was established.

---

[4]    The unheated pipeline requires light crude to blend with the San Joaquin Valley heavy crude to obtain a viscosity that allows the crude oil to flow efficiently. Use of the KLM Pipeline is constrained by the limited amount of light crude available in the San Joaquin Valley.

[5]    A tariff, which "public utilities" are required to file, is a schedule showing all rates, tolls, rentals, charges, and classifications together with all rules, contracts, privileges, and facilities which in any manner affect or relate to rates, tolls, rentals, classifications, or service. (*Southern Cal. Edison Co. v. Public Utilities Com.* (2000) 85 Cal.App.4th 1086, 1097.)

Shell Products and Shell Trading sought judicial review by filing a petition for writ of review with the Second Appellate District of the Court of Appeal. In June 2008, the petition was denied. Two months later, the California Supreme Court denied a petition for review. Consequently, the Commission's decision that the SJV Pipeline had been dedicated to public use and the order directing the Shell affiliates to file a tariff is a final decision and no longer subject to challenge in court.

*The Second Proceeding Before the PUC*

The present proceedings began in March 2008, when Chevron filed a complaint with the Commission alleging that since at least April 1, 2005, the Shell affiliates had not filed tariffs setting forth the rates, terms and conditions of service for the pipeline. Chevron again requested the Commission to order the Shell affiliates to pay Chevron a refund equal to the difference between the rates Chevron actually paid after April 1, 2005, and the reasonable rates determined by the Commission.

A description of the proceedings before the Commission is set forth below in part II.A.

In March 2012, the matter reached this court when Pipeline Company and Shell Trading filed a petition for writ of review. The two primary disputes raised by the petition concern (1) whether the Commission properly analyzed the statute of limitations that applies to the shippers' refund claims and (2) whether the Commission erred in treating the storage tanks and truck racks as part of the public utility.

In May 2012, the Commission filed a motion to dismiss issues in the petition involving the statute of limitations determinations. This court granted the motion to dismiss in an order dated October 31, 2013, and explicitly stated that the order was not a decision on the merits, was not to be given law-of-the-case effect, and was without prejudice to the right of any party to raise an issue anew after the Commission's final determination of the refund and statute of limitations issues.

7.

**DISCUSSION**

I.     COURT REVIEW OF COMMISSION DECISIONS

The Commission is a state agency of constitutional origin with far-reaching duties, functions and powers. (Cal. Const., art. XII, §§ 1-6.) Its primary purpose is to supervise and regulate every public utility in California. (Pub. Util. Code, § 701.) In undertaking these functions, the Commission has been given administrative, legislative and judicial powers. (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 915.)

Hearings and rehearings conducted by the Commission are governed by articles 1 and 2, respectively, of chapter 9, part 1, division 1 of the Public Utilities Code. Judicial review of the Commission's decisions is governed by article 3 (i.e., Pub. Util. Code, §§ 1756-1768) of the same chapter.

A party aggrieved by the Commission's final decision may petition for a writ of review in the court of appeal. (Pub. Util. Code, § 1756, subd. (a).) Before seeking judicial review, the aggrieved party must file an application for rehearing. (Pub. Util. Code, § 1756, subd. (a).) The application for rehearing must raise each issue that the party intends to raise in the court of appeal—that is, the party must exhaust its administrative remedies. (Pub. Util. Code, § 1732.) As a result of these requirements, matters before this court will involve the Commission's original decision and its subsequent decision on the application for rehearing.

Because Public Utilities Code section 1756, subdivision (a) used the word "may," this court's review is described as discretionary rather than mandatory. (*The Ponderosa Telephone Co. v. Public Utilities Com.* (2011) 197 Cal.App.4th 48, 55.) However, petitions for a writ of review function as appeals from the administrative decision and should not be denied on policy grounds unrelated to their merits. (*Id.* at p. 56.)

The scope of judicial review of Commission decisions is set forth in Public Utilities Code section 1757. That provision authorizes us to determine whether the Commission (1)

acted without, or in excess of, its jurisdiction; (2) proceeded in the manner required by law; (3) issued a decision not supported by the findings; (4) made findings not supported by substantial evidence in light of the whole record; (5) abused its discretion; or (6) violated a constitutional right.  (Pub. Util. Code, § 1757, subd. (a).)

## II.    STORAGE TANKS AND TRUCK RACKS AS AN INTEGRAL PART OF THE PUBLIC UTILITY

The following overview identifies the main procedural steps before the Commission that are relevant to the issues raised by the petitioners about the storage tanks and truck racks.  The proceedings started in December 2005 and ended over six years later in February 2012.

The first proceeding produced a July 2007 general determination by the Commission that the SJV Pipeline had been dedicated to the public use.  The Commission did not address dedication on an asset-by-asset basis and, accordingly, made no specific findings about the dedication of the storage tanks and truck racks.  The first proceeding ended in 2008 when the California Supreme Court denied review.

In the second proceeding, Pipeline Company and Shell Trading asked in September 2008 that certain storage tanks and truck racks be excluded from the assets that constituted the public utility pipeline, arguing (among other things) that there had been no finding that the storage tanks and truck racks had been dedicated to public use.  Ultimately, the Commission in May 2011 rejected the request to exclude the storage tanks and truck racks.  The Commission interpreted its 2007 decision that the SJV Pipeline had been dedicated to public use as also deciding the dedication issue concerning the storage tanks and truck racks.  This interpretation of the 2007 decision, which is a critical point of the present disagreement, is consistent with the broad statutory definition of a "pipe line" in Public Utilities Code section 227.

The petitioners' writ asserts that the Commission improperly "presumed" the tanks and racks had been dedicated to public use and builds its claims of error on this view of

9.

what the Commission did.  Thus, an important issue is whether the Commission presumed dedication or, alternatively, resolved that question by interpreting the determination in its 2007 decision that the SJV Pipeline had, in fact, been dedicated to public use.

We resolve this issue by concluding that the Commission's final decision regarding the tanks and racks did not presume dedication had occurred, but interpreted its prior decision that the SJV Pipeline had been dedicated to public use as covering  the truck racks and storage tanks in question.  Further, we conclude that the Commission had the authority to determine the scope of its earlier, general dedication decision and, in exercising that authority, did not violate any established principle of law or abuse its discretion.  Therefore, we deny the petition insofar as it challenges the dedication of the truck racks and storage tanks.

A.      Background Facts and Proceedings Before the Commission

*1.      Initial Complaints and Decisions*

Chevron's 2005 complaint alleged that the "Shell Pipeline meets the statutory definition of a public utility pipeline."  The complaint defined the term "Shell Pipeline" as "an approximately 265 mile long 20[-inch] heated oil pipeline (and associated trunk and gathering lines) running from the San Joaquin Valley producing fields to refineries in the Bay Area …."  The complaint made no mention of truck racks or storage and blending tanks, much less alleged any racks or tanks had been dedicated to public use.

Tesoro filed a petition to intervene in the proceeding initiated by Chevron's 2005 complaint.  Tesoro's petition did not mention truck racks or storage tanks.

Consistent with the pleadings, the Commission's Decision 07-07-040 dated July 26, 2007, which generally held the SJV Pipeline to be a public utility**,** made no mention of truck racks or storage and blending tanks.  Conclusion of law No. 9 of that decision stated: "Equilon and Shell Trading have manifested an unequivocal intention to dedicate the 20" Pipeline to public use by engaging in the business of transporting oil for a fee."

10.

Shell Products filed an application for rehearing of Decision 07-07-040. In December 2007, the Commission filed Decision 07-12-021, which modified Decision 07-07-040 and denied Shell Products's application for a rehearing. Among other things, the modification added a paragraph to the order that stated: "Shell is directed to file tariffs for its third party contracts." Neither the application for rehearing nor the new decision mentioned ancillary assets such as storage tanks and truck racks.

Shell Products and its affiliates attempted to obtain judicial relief from the Second Appellate District and the California Supreme Court without success. As a result, Decision 07-07-040 and Decision 07-12-021, which addressed whether the pipeline had been dedicated to public service, became final.

### 2. Second Series of Complaints

In March 2008—approximately three months after Decision 07-12-021 was filed and before Shell Products complied with the directive to file an application for approval of tariffs—Chevron filed a complaint with the Commission that requested a determination of "just and reasonable rates, terms and conditions for [Shell Products'] transportation of crude oil on the Shell Pipeline effective April 1, 2005" and an order directing Shell Products "to refund to Chevron the difference between the rates paid by Chevron from April 1, 2005 and the reasonable rates determined by the Commission …." Chevron's complaint did not mention truck racks or storage and blending tanks.

In February 2009, Tesoro filed a complaint with the Commission that was similar to Chevron's March 2008 complaint in that Tesoro also requested (1) the Commission to determine just and reasonable rates, terms and conditions for the transportation of crude oil on the Shell Pipeline from April 2005 and (2) a refund of the difference between what Tesoro paid for shipment of crude oil and the reasonable rates determined by the Commission.

11.

Tesoro's initial complaint was different from Chevron's in that Tesoro alleged Shell Products and its affiliates "have in the past and continue at the present time to deny access to Tesoro and other unaffiliated shippers to ancillary facilities of the Shell Pipeline, such as truck loading racks and storage and blending tanks. These facilities are incident to and an inherent part of pipeline transportation service and are therefore subject to the Commission's jurisdiction. While refusing to provide access to these ancillary facilities to third party shippers, [Shell Products and its affiliates] have acted in a discriminatory manner by providing access to these facilities to their own affiliates." In its request for relief, Tesoro also asked for a finding that Shell Products and its affiliates violated the Public Utilities Code by "[r]efusing to provide access to shippers on its line to loading and unloading facilities, tanks and other facilities that are an integral part of pipeline transportation in violation of Public Utilities Code §§ 453 and 461.5."

Tesoro's amended complaint, filed in March 2009, omitted (1) the foregoing allegation regarding loading facilities and tanks and (2) the request for a finding regarding the refusal of access to these facilities and tanks. The specific allegations regarding loading facilities and tanks, however, may have been subsumed by Tesoro's broad allegation that Shell Products and its affiliates continued to impose "unjust and unreasonable terms and conditions of service …."

Later in March 2009, Valero filed a complaint seeking a refund of the difference between the rates Valero paid from April 1, 2005, through the effective date of the tariff and reasonable rates approved by the Commission. Valero's complaint did not mention loading facilities or tanks.

### 3. *Pipeline Company's Tariff Application*

On September 30, 2008, Pipeline Company filed an application for approval of tariffs with the Commission. The filing of the application occurred between Chevron's filing of its March 2008 complaint and the filings in 2009 of Tesoro's and Valero's complaints seeking

12.

refunds. Besides addressing the tariff, the Pipeline Company's application also requested the Commission to approve the transfer of ownership of the SJV Pipeline assets to Pipeline Company from Shell Products.

The application described the various trunk lines that constituted the SJV Pipeline and mentioned other assets by stating: "In addition to the pipelines, the SJV Pipeline system includes pumps, heaters, field control rooms, custody transfer units, breakout tanks, meters, meter provers, gauging field laboratories, and facilities connecting to the computerized control center. A more detailed list of assets making up the SJV Pipeline is set forth in the Direct Testimony of Paul Smith."

The direct testimony of Paul Smith was submitted to the Commission in a written question-and-answer format along with Pipeline Company's application for approval of the tariff and ownership transfer. At the time, Smith identified his job title as "Oil Movements Manager" and his employer as Shell Pipeline Company LP. Smith was asked to identify the assets that constituted the pipeline and how the determination was made. Smith stated that "[t]he assets were determined by indentifying what was required to provide the crude oil shipments from the origin points listed in the tariff to the destination points listed in the tariff." Smith then stated that "[t]he SJV Pipeline system generally consists of the following assets …." The list Smith provided included (1) lateral pipelines and gathering systems with pipelines that measured from 8 inches to 16 inches, (2) stations at various locations, (3) the Bakersfield Tank Farm, and (4) separately identified segments of the 20-inch pipeline. For purposes of this writ proceeding, we will describe only the assets at the Bakersfield Tank Farm, Rio Bravo Station, Coalinga Station, and Olig Station.

According to Smith's testimony, the equipment and facilities at the Bakersfield Tank Farm included "pumps, heater, custody transfer meters, meter prover, gauging field laboratory, and breakout tanks needed to accommodate pipeline operations. Excludes truck racks and four tanks held for private use (Tank No. 104, 106, 107, and 108)."

13.

For the Rio Bravo Station, Smith stated: "Types of equipment include pumps, heater, field control room, and other assets used to facilitate crude oil movement through the station except one tank held for private use (Tank 96GK6)."

For the Olig Station, Smith stated: "Types of equipment include pumps, meters, break out tanks, meter prover, and field control room."

For the Coalinga Station, Smith listed "breakout tanks, meters, pumps, meter prover, gauging field laboratory, offices, and field control room. Excludes truck racks and two tanks (120CH14, 258CH7) held for private use."

### 4. *Commission's Treatment of Ancillary Facilities Issue*

In April 2009, the Commission filed a scoping memo and ruling regarding Shell Products' application for approval of tariff and the complaints filed by Chevron, Tesoro and Valero. With the concurrence of the parties, the Commission directed that the four matters be consolidated as a ratesetting proceeding.

The scoping memo enumerated 10 issues that were appropriate for resolution in the proceedings. The sixth issue was stated as follows: "Does the Commission's jurisdiction over the Pipeline extend to loading and unloading facilities, tanks, pipeline connections and other ancillary facilities which [Pipeline Company] does not permit shippers to use?"

The scoping memo also set forth a schedule that addressed (1) the submission of written evidence by the parties, (2) an evidentiary hearing, (3) the filing of concurrent opening and reply briefs, (4) the issuance of a proposed decision, and (5) the parties' comments and replies to comments on the proposed decision. The schedule left open the date for the final decision.

### 5. *Evidence Concerning Ancillary Facilities*

The parties submitted written testimony to the Commission regarding the inclusion of ancillary facilities in the public utility.

14.

Pipeline Company submitted rebuttal testimony of Smith that addressed assets mentioned in the testimony he submitted with the tariff application. Smith stated that additional review and assessment had caused a change in the assets he originally identified as being required to provide common carrier service for the crude oil shipments listed in the tariff. These changes concerned tanks and related property located at the Bakersfield Tank Farm, the Rio Bravo Station, the Coalinga Station, and the Olig Station. Smith stated that the revisions to the assets deemed part of the common carrier would not impact the common carrier transportation services of crude oil described in the tariff.

As to the Rio Bravo Station, Smith testified that the 10,000-barrel tank and a tank mixer had been identified as being in noncarrier service.

As to the Bakersfield Tank Farm, Smith noted that he previously identified tank Nos. 104, 106, 107 and 108 as being held for private use and stated that tank No. 103 also was not required for common carrier services. Smith also listed miscellaneous property that had been identified as noncarrier, which included certain pumps, motors and Jensen mechanical actuators for the noncarrier tanks.

As to the Coalinga Station, Smith stated that miscellaneous assets related to the truck racks had been identified and reclassified as not required for common carrier service.

As to the Olig Station, Smith stated that the 150,000-barrel tank and miscellaneous assets were not required for the common carrier service described in the tariff.

Tesoro presented testimony by Mark Georgen, its director of tools and analysis, which stated that excluding certain tanks from the storage services offered to the shippers would have a negative impact on the shippers because it would reduce the ability of the system to segregate higher quality crude oil from lower quality crude oil and would provide Shell Products and its affiliates with a significant economic advantage over the competing Tesoro and Valero refineries. Georgen also stated that Coalinga truck racks were used by Shell Products and its affiliates to unload high sulfur San Ardo crude oil, which was blended into the common stream of SJVH sent to the shippers, but Shell Products and its affiliates

15.

did not bear any penalty or price adjustment for including the high sulfur crude in the stream.**6**

### 6. *Parties' Briefing and Comments to Proposed Decisions*

Chevron's opening brief, filed in June 2010, asserted that the Commission should not allow Shell Products to remove used or useful assets from public utility service. Chevron argued that Shell Products had the burden of proving the assets were not used or useful in the provision of public utility service and had failed to carry that burden.

Pipeline Company's concurrent opening brief took a different view of the burden of proof regarding the status of the ancillary assets. "For Independent Shippers to prevail on their claim [regarding the tanks and truck racks] they must prove that: (1) the facilities have been held out for use to third parties for compensation; and (2) that the facilities are related to and necessary for the provision of public utility pipeline transportation services on the SJV Pipeline. Independent Shippers have failed to do so."

In July 2010, Pipeline Company filed a reply brief that argued the truck racks and tanks could not be found to have public utility status in the absence of a demonstration that each such asset had been made available to the public—that is, an unaffiliated third party. Pipeline Company asserted that the assets have either been idle or made available only to Shell Trading and had not been held out for service to the public. Pipeline Company reiterated its view that shippers *failed to establish* the ancillary assets were made available to the public and, thus, dedicated to public service.

Shell Trading also filed a reply brief in July 2010. Shell Trading specifically asserted the evidence that the truck racks at the Coalinga Station were used to unload San Ardo crude, which was commingled with the stream of SJVH crude in the pipeline, "does not

---

**6** Valero's June 2010 opening brief asserted Shell Products was engaging in five types of abuses that favored Shell Product's affiliates. One of the alleged abuses was blending inferior California Outer Continental Shelf crude into the pipeline and charging the shippers as if the resulting blend was all SJVH crude.

demonstrate that these facilities are dedicated to the public. This evidence shows simply that these facilities can be used by the owner to maximize delivery flexibility into the Pipeline."

In October 2010, an administrative law judge issued a proposed decision denying the application of Pipeline Company to charge market-based rates for transportation on crude oil. The parties were given an opportunity to comment on this proposed decision.

In March 2011, the administrative law judge issue a proposed decision setting rates for transportation of crude oil, ordering refunds, and adopting tariffs for heated oil service. Again, the parties were given the opportunity to comment on the proposed decision.

In April 2011, Shell Trading filed reply comments addressing points raised in the shippers' opening comments. Shell Trading asserted:

> "Private storage tanks and truck racks that have been used exclusively by [Shell Trading] for its injections of crude oil into the pipeline are not necessary to provide jurisdictional pipeline service and have not been held out for use by third parties."

Shell Trading argued that the shippers' claims confused proprietary storage tanks that were not included as part of Pipeline Company's jurisdictional assets with "break-out" tanks that were included. Shell Trading asserted that the "break-out" tanks were used to receive and store crude oil transported to the pipeline for reinjection and continued transportation by the pipeline and thus were necessary for the operation of the pipeline. In contrast, Shell Trading asserted the storage tanks were operational only because it paid all the costs of refurbishing the tanks so that it could use the tanks for long-term storage. Shell Trading further asserted that none of the storage tanks have been used by shippers.

Similarly, Shell Trading asserted that (1) the truck racks in question were used by it to inject crude oil at various points on the pipeline, (2) no other shipper used the truck rack facilities, and (3) Shell Products and its affiliates did not hold out these truck rack facilities for use by the shippers or other members of the public.

17.

Shell Trading also attacked the claim in Georgen's testimony that removing the truck racks and storage tanks from public utility service would have a detrimental impact on the shippers. Shell Trading argued that it is impossible to remove from public service assets that have never been used as such and the claim of detrimental impact is really a claim that the shippers are entitled to free benefits from Shell Trading's investment in the facilities.

### 7. *Commission's Decision 11-05-026*

In May 2011, the Commission issued Decision 11-05-026 in the consolidated proceeding. The decision's opening summary stated the Commission approved "the transfer of physical assets from the Pipeline's former owner to [Pipeline Company]" and denied the application of Pipeline Company "to exclude certain tanks and truck racks from the assets transferred to it."

Section 2.1 (pages 4 through 9) of Decision 11-05-026 was labeled "Jurisdictional and Necessary Property" (boldface omitted) and addressed whether ancillary property— primarily tanks and truck racks—were subject to the Commission's jurisdiction and necessary to the common carrier operation of the SJV Pipeline.

The Commission's resolution of a procedural issue—who bore the burden of proof— was critical to its ultimate decision to treat the ancillary assets as part of the public utility. The Commission determined the applicants were required to prove that the ancillary property they wished to exclude from the transfer of the SJV Pipeline to Pipeline Company was unnecessary to the operation of the SJV Pipeline as a public utility.

Part of the Commission's rationale was that (i) the applicants had the ultimate burden of proving that the rates sought were reasonable and (ii) proving the excluded property was unnecessary to the operation of the SJV Pipeline was an essential part of demonstrating the reasonableness of the rates requested.

The Commission discussed the testimony of Paul Smith, Harry J. Rathermel and Mark Georgen. The Commission noted that Georgen's testimony raised plausible concerns

18.

about the exclusion of the tanks and truck racks from the property regarded as part of the common carrier and the probability that the exclusion would lead to discrimination in favor of Shell Products and its affiliates. Although Smith testified that the tanks and truck racks were not necessary to operate the SJV Pipeline as a public utility, the Commission stated that the applicants had not effectively rebutted the argument that excluding those assets would facilitate unlawful discrimination.

To bolster its finding that the ancillary assets were part of the public utility, the Commission stated:

> "Furthermore, Independent Shippers argue correctly that, subject to certain statutory exceptions that do not apply to this case, a regulated utility may not remove property from public service without obtaining Commission approval. Typically, utilities seek such approval on an asset-by-asset basis by filing applications under Pub. Util. Code § 851. To the extent that this application seeks approval for transfer of the ancillary assets from [Pipeline Company] to Shell affiliates, it is a *de facto* application for § 851 approval. In general, we grant approval of such transfers under § 851 only upon a showing by the utility that the property in question is not 'necessary or useful in the performance of its duties to the public.' For the reasons outlined above, we believe that [Pipeline Company] has not made the requisite showing here and we do not approve the exclusion of those assets from the jurisdictional property of the Pipeline." (Fns. Omitted.)

In closing its discussion of the ancillary assets, the Commission stated that its decision did not preclude Pipeline Company from filing a subsequent application under Public Utilities Code section 851 for permission to remove specific assets from public service.

8.    *Applications for Rehearing*

In July 2011, Pipeline Company filed an application for a rehearing of Decision 11-05-026 that presented a number of arguments challenging the Commission's approach to the tanks and truck racks. Pipeline Company contended that the Commission never addressed an essential question—whether the tanks and truck racks had been dedicated to public service—and, thus, never made the requisite findings of fact and conclusions of law

regarding public dedication. Pipeline Company also contended that the Commission's decision regarding the burden of proof was erroneous.

Like Pipeline Company, Shell Trading filed an application for a rehearing of Decision 11-05-026. Shell Trading argued (1) the Commission erroneously relied on Public Utilities Code section 851 to shift the burden of proof; (2) the privately owned storage tanks and truck racks were not necessary to provide crude oil transportation services to the shippers; (3) the storage tanks and truck racks had never been dedicated to public use; and (4) the Commission's decision to include the storage tanks and truck racks in the assets of the public utility amounted to an unlawful taking of private property in violation of the federal and state constitutions.

### 9. *Commission's Decision 12-02-038*

In February 2012, the Commission issued Decision 12-02-038, which rejected the arguments raised by Pipeline Company and Shell Trading concerning the ancillary assets.

Decision 12-02-038 addressed the dedication of the storage tanks and truck racks by stating: "The issue of dedication to public use was presumed, since that issue had been decided in D.07-07-040." In the Commission's view, its determination in Decision 07-07-040 that the 20-inch pipeline had been dedicated to public use[7] decided the dedication issue concerning the ancillary assets.

In addition, the Commission reviewed the explicit findings and conclusions enumerated in Decision 11-05-026 that determined the ancillary assets in question were public utility assets. The Commission stated (1) its earlier findings and conclusions were sufficient to comply with the requirement for findings and conclusions set forth in Public

---

[7] Conclusion of law No. 9 in Decision 07-07-040 stated: "[Shell Products] and Shell Trading have manifested an unequivocal intention to dedicate the 20" Pipeline to public use by engaging in the business of transporting oil for a fee."

20.

Utilities Code section 1705,[8] (2) the findings were supported by sufficient evidence, and (3) it had correctly assigned the burden of proof and weighed the evidence.

B.     Dedication of Ancillary Assets to Public Use

Petitioners contend that the Commission simply presumed that the storage tanks and truck racks had been dedicated to the public use, which caused the Commission to fail to make the statutorily required findings on dedication and caused the Commission to erroneously place the burden of proof regarding dedication on them.

The Commission argues that the petitioners have unduly focused on the word "presumed" and that its statement that the dedication issue was decided in Decision 07-07-040 was based on inferences reasonably drawn from the record evidence and findings in the 2007 decisions.  In effect, the Commission contends that it interpreted its earlier decision on the question of dedication and its interpretation was reasonable.

The shippers support the Commission's position by arguing that the dedication determination in Decision 07-07-040 regarding the SJV Pipeline necessarily included all of the ancillary assets disputed in this proceeding.  The shippers support this argument by citing the definition of "[p]ipe line" contained in Public Utilities Code section 227.  Under that definition, a "[p]ipe line" includes "all real estate, fixtures, and personal property, owned, controlled, operated, or managed in connection with or to facilitate the transmission, storage, distribution, or delivery of crude oil or other fluid substances except water through pipe lines."[9]

---

[8]     Public Utilities Code section 1705 provides that the Commission's "decision shall contain, separately stated, findings of fact and conclusions of law by the commission on all issues material to the order or decision."

[9]     Related statutory definitions include "[p]ipeline corporation," which is defined by Public Utilities Code section 228 to include "every corporation or person owning, controlling, operating, or managing any pipeline for compensation within this state," subject to an exception that is not relevant to this proceeding.  "Public utility" is defined by Public Utilities Code section 216, subdivision (a) to include every "pipeline corporation … where

21.

The foregoing arguments present this court with the following broad question: Did the Commission properly handle the dedication issues that were raised in the consolidated proceeding? As background for our analysis of this question, we will discuss whether the Commission acted in accordance with the law in 2007 when it made a general determination (as opposed to asset-by-asset determinations) that the SJV Pipeline had been dedicated to public use.

### 1. 2007 Dedication Decision

In Decision 07-07-040, the Commission stated as a conclusion of law that Shell Products "and Shell Trading have manifested an unequivocal intention to dedicate the 20" Pipeline to public use by engaging in the business of transporting oil for a fee."

This determination dealt with the SJV Pipeline in a general way, which is how the issue of dedication was presented by the parties. For instance, the pleadings in the initial proceeding indicate that the parties did not raise issues regarding the dedication of particular assets. Instead, they argued about the SJV Pipeline as though it were a single object. (See I.A.1, above.) The Commission addressed the issues as presented by the parties and, thus, did not violate its statutory duty to separately state findings of fact and conclusions of law "on all issues material to the order or decision." (Pub. Util. Code, § 1705.)

Petitioners have cited no authority construing the statutory requirement for findings "on all issues material" to require specific findings on issues not addressed by the parties. More generally, they have cited no authority requiring the Commission to resolve the dedication issue on an asset-by-asset basis when the parties have not presented evidence and

---

the service is performed for, or the commodity is delivered to, the public or a portion thereof." A pipeline corporation that receives compensation or payment for performing services for, or delivering commodities to, the public is subject to the jurisdiction and regulation of the Commission. (Pub. Util. Code, § 216, subd. (b); see generally, 49 Cal.Jur.3d (2010) Pipelines, § 1, p. 640.)

argument about whether a specific asset is operated or managed in connection with the enterprise alleged to be a public utility.

Therefore, we conclude that the Commission's 2007 decision that the SJV Pipeline had been dedicated to public use was appropriate under the circumstances. The generality of that decision was not (1) an action outside or in excess of its jurisdiction, (2) the result of a failure to proceed in the manner required by law, or (3) an abuse of discretion. (See Pub. Util. Code, § 1757, subd. (a).) Consequently, the Commission's 2007 decision regarding dedication does not contain an error that undermines or infects the Commission's subsequent decisions.

### 2. *Subsequent Treatment of the Dedication Issue*

Our analysis of the petitioners' claims of error involving the truck racks and storage tanks must consider the cornerstone contention on which these claims are built—namely, the contention that "the Commission merely *presumed* the assets were dedicated to use by third parties. This approach contravenes the law." Based on this view of the Commission's decisions, the petitioners assert that "the Commission made not a single finding of fact about whether the truck racks and storage tanks that the Shippers seek to conscript were actually dedicated to public service."

We disagree with the petitioners' characterization of how the Commission resolved the question regarding the dedication of the specific assets. The contention that the Commission made an unanalyzed presumption simply misreads the Commission's decisions.

In Decision 12-02-038, the Commission stated: "The issue of dedication to public use was presumed, since that issue had been decided in D.07-07-040."

To determine precisely what this statement meant, we must consider the context in which it was made. Decision 12-02-038 was issued to address the points raised in the petitioners' application for a rehearing of Decision 11-05-026.

23.

Pipeline Company's application for rehearing asserted that Decision 11-05-026 did not contain a finding that the truck ranks and storage tanks had been dedicated to public use. The application also asserted the decision addressed and answered the wrong question about the truck racks and storage tanks and argued that "[t]he actual holding is uncertain because of the curious approach adopted by the Decision."

In view of this claim about a curious approach[10] and uncertainty, the Commission's statement that "[t]he issue of dedication to public use was presumed" was an attempt to remove any uncertainty that Decision 11-05-026 might have contained by providing an explanation of the Commission's reasoning. Thus, the statement should be read to mean: "The issue of [the truck racks' and storage tanks'] dedication to public use was presumed [in Decision 11-05-026] …." In other words, the Commission acknowledged that Decision 11-05-026 did not discuss the dedication issue.

Next, the Commission gave the reason why the dedication issue had not been discussed in Decision 11-05-026 by including the clause "since that issue has been decided in D.07-07-040." The purpose of this clause was to remedy the omission in Decision 11-05-026 and specifically identify how the Commission resolved the question regarding the dedication of the truck racks and storage tanks. By stating that the issue had been decided in Decision 07-07-040, the clause informed the parties that the Commission's general determination that the SJV Pipeline had been dedicated to the public use also operated as a determination that the specific assets in question had been dedicated to public use.

Our approach to what the Commission meant in Decision 12-02-038 is consistent with the well-established principle that there is a strong presumption that the Commission's decisions are valid. (*Greyhound Lines, Inc. v. Public Utilities Com.* (1968) 68 Cal.2d 406,

---

**10** This reference appears to concern the Commission's decision to treat Pipeline Company's application for transfer of the SJV Pipeline as including an application for Public Utilities Code section 851 approval with respect to the truck racks and storage tanks.

24.

410 (*Greyhound*).)  In contrast, the petitioners' characterization of the Commission's decision seems to construe that decision in the light most favorable to their own position—an approach which turns the presumption of validity on its head.

In summary, we conclude that the Commission did not simply presume, without analysis, that the truck racks and storage tanks had been dedicated to public use.  Instead, the Commission interpreted its early general determination that the SJV Pipeline had been dedicated to public use and determined that this general determination covered the truck racks and storage tanks in question.  The Commission's interpretation was consistent with the statutory definition of a "pipe line," which "includes *all* real estate, fixtures, and personal property, owned, controlled, operated, or managed in connection with or to facilitate the transmission, storage, distribution, or delivery of crude oil or other fluid substances except water through pipe lines."  (Pub. Util. Code, § 227, italics added; see *Steward Title Co. v. Herbert* (1970) 6 Cal.App.3d 957, 962 ["all" does not admit an exception or exclusion not specified].)

### 3.    *Need for Specific Findings*

The petitioners argue that the statutory definition of "pipe line" should not be imported into the Commission's decision to resolve disputed questions of fact about whether Shell Products and Shell Trading had an unequivocal intention to dedicate the truck racks and storage tanks to public use.  The petitioners further argue that Public Utilities Code section 1705 and established precedent required the Commission to address the dedication of the disputed truck racks and storage tanks and make specific dedication findings before regulating those assets.

Based on these arguments, we will consider whether the Commission failed to proceed in the manner required by law because it violated Public Utilities Code section 1705, which provides that the Commission's "decision shall contain, separately stated,

25.

findings of fact and conclusions of law by the commission on all issues material to the order or decision."[11]

An issue "material" to Decision 12-02-038 was whether the dedication of the truck racks and storage tanks had been decided previously. The Commission explicitly resolved this material issue by stating that the issue of dedication to public use had been decided in Decision 07-07-040.[12] Thus, the Commission complied with the statutory requirement to address "all issues material to the … decision." (Pub. Util. Code, § 1705.) Whether the Commission committed error in deciding that material issue is a separate question, but the Commission did not violate its legal obligation to inform the parties of the basis for its decision.

Therefore, the Commission proceeded in the manner required by Public Utilities Code section 1705 with respect to the material issue concerning the scope of Decision 07-07-040 and whether that general dedication determination covered the truck racks and storage tanks.

### 4. Proper Scope of a Prior Dedication Determination

Because the Commission clearly disclosed how it arrived at its conclusion that the truck racks and storage tanks were dedicated to public use and thus subject to the Commission's jurisdiction, the next issue is whether that conclusion was erroneous.

Here, the Commission was confronted with a situation where (1) it had made a general determination that an oil pipeline had been dedicated to public use and (2) the issue

---

[11]    This requirement for findings of fact and conclusions of law is related to the statutory authorization of judicial review of whether the decision of the Commission is, or is not, supported by the findings. (Pub. Util. Code, § 1757, subd. (a)(3).)

[12]    The petitioners' claim that the Commission was required to make specific findings for the challenged truck racks and storage tanks is premised on their erroneous assertion that the Commission made an unanalyzed presumption that the truck racks and storage tanks were dedicated to public oil transportation service.

of the dedication of specific assets was raised in a second proceeding. These circumstances required the Commission to decide how to handle the question of the dedication of the specific assets. That decision would depend, in large part, on how the Commission conceptualized the scope of its earlier, general dedication decision.

The most basic question about the scope of a general dedication decision is whether that scope can be defined and used to resolve a question about the dedication of a specific asset. Conceptually, the scope (i.e., the parameters or boundaries) of the general dedication decision could be viewed as so nebulous and ill-defined that the decision is completely useless in subsequent disputes about the dedication of particular assets. Under this view, whether an asset was part of the public utility would remain uncertain until resolved in a subsequent proceeding by the Commission. In that subsequent proceeding, a person or entity claiming a specific asset was part of the public utility would have to prove that asset had been dedicated to public use.

In contrast, the scope of the general dedication decision could be conceptualized as fairly well defined, with the generality being brought into focus by reference to a source outside the decision itself. Here, the obvious outside source is the statutory definition of "pipe line" in Public Utilities Code section 227. (See also, Pub. Util. Code, §§ 217 [electric plant], 221 [gas plant], 223 [heating plant], 225 [passenger stage], 229 [railroad], 230.5 [sewer system], 231 [street railroad], 233 [telephone line] & 235 [telegraph line].) The rationale for using the statutory definition has two components—notice to the parties and legislative intent. First, when a company that operates a pipeline offers transportation services to the public and risks an adjudication that deems the pipeline to be a public utility, the statutory definition of "pipe line" places that company on notice of the assets that will be regarded as part of the public utility pipeline. Second, the statutory definition identifies the assets that the Legislature intended to be within the Commission's jurisdiction and obviates the need for the Commission to devote scarce resources to examining minutiae and producing a detailed statement of the scope of each dedication.

27.

Existing case law does not address the basic question about whether the scope of a general dedication decision is (1) too ill-defined to be useful in determining the status of peripheral assets, (2) defined by the statutory definition of the particular enterprise, or (3) is defined in some other manner.

Because the statutes and case law do not provide a explicit answer about the scope of a general dedication decision, we will apply the presumption that the Commission's decisions are valid (*Greyhound*, *supra*, 68 Cal.2d at p. 410) and consider whether the petitioners have demonstrated that the Commission made one of the errors identified in the statute that establishes the scope of judicial review. (See Pub. Util. Code, § 1757, subd. (a).)

First, when the Commission reached its conclusion about the scope of the general dedication decision, did the Commission act without, or in excess of, its powers or jurisdiction? (See Pub. Util. Code, § 1757, subd. (a)(1).) The power and jurisdiction of the Commission is established by the California Constitution and statute. The Commission may supervise and regulate every public utility in California and "may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction." (Cal. Const., art. XII, § 1; Pub. Util. Code, § 701.) This grant of authority has been liberally construed by the courts. (*Utility Consumers' Action Network v. Public Utilities Com.* (2004) 120 Cal.App.4th 644, 654.)

Under the foregoing constitutional and statutory provisions, we conclude that it is "necessary and convenient" for the exercise of the Commission's power and jurisdiction for the Commission to be able to determine the scope of its earlier decisions. Thus, we conclude that the Commission has the power to decide the scope of an earlier, general dedication decision. Applying this statutory interpretation to the facts of this case, we conclude that the Commission acted within its jurisdiction when it stated: "The issue of dedication to public use … had been decided in D.07-07-040."

28.

Second, we consider whether the Commission failed to proceed in the manner required by law. (Pub. Util. Code, § 1757, subd. (a)(2).) Petitioners have cited no statute, regulation or judicially adopted principle that addresses how the Commission is to address questions about the scope of a general dedication determination when disputes subsequently arise about whether specific assets were dedicated. For example, no statutory provision states that when a party challenges whether particular assets are included in a general determination regarding dedication to public use, the Commission must proceed as though each asset is included in (or excluded from) the dedication. Furthermore, the *Greyhound* decision did not address the issue presented in this case—how the Commission should determine the scope of an earlier, general dedication determination—and cannot be read as requiring asset-by-asset dedication determinations.[13] Thus, the petitioners have not affirmatively demonstrated that the Commission failed to proceed "in the manner required by law" when it interpreted Decision 07-07-040 to resolve what assets were included within the scope of the dedication determination.[14] (Pub. Util. Code, § 1757, subd. (a)(2).)

Third, the Commission's conclusion about the scope of its general dedication decision could be regarded as erroneous if it "was an abuse of discretion. (Pub. Util. Code, § 1757, subd. (a)(5).) The abuse of discretion standard can be restated as whether the Commission exceeded the bounds of reason. (See *Brawley v. J.C. Interiors, Inc.* (2008) 161 Cal.App.4th 1126, 1137 [appropriate test for abuse of discretion is whether trial court exceeded the bounds of reason].) Here, the Commission appears to have based its

---

[13] The *Greyhound* case involved an order by the Commission that a bus company modify its passenger service routes within its service territory. The court's statement that "there must be an unequivocal intention to dedicate property to public use" (*Greyhound*, *supra*, 68 Cal.2d at p. 413) does not create a rule of law that the Commission must determine the issue of dedication on an asset-by-asset basis.

[14] Because the petitioners failed to recognize the Commission's action as an interpretation of Decision 07-07-040, they have provided no authority that addresses how the Commission should proceed when interpreting its prior decisions.

determination that the dedication issue had been decided in Decision 07-07-040 on (1) the contents of that decision and (2) the statutory definition of the term "pipe line." Far from exceeding the bounds of reason, this approach of referring to a statutory definition to resolve the scope of an earlier, general dedication decision is eminently reasonable. The statutory definition was readily available to the parties and was a fundamental part of the law that identified what would be within the Commission's jurisdiction after a finding that the pipeline had been dedicated to the public use. In other words, during the course of the initial proceeding, the parties should have understood the consequences of a general determination that the pipeline had been dedicated to the public use because the statutory definition of "pipe line" identified the real estate, fixtures and personal property considered part of the pipeline. In addition, the inclusion of the truck racks and storage tanks within the general dedication determination is consistent with the axiom that "[t]he greater contains the less." (Civ. Code, § 3536.) Therefore, the Commission did not exceed the bounds of reason when it decided the scope of its general dedication determination in a manner that is consistent with the broad statutory definition.

Based on the foregoing analysis, we reject the petitioners' argument that the Commission was required to make a separate dedication finding for the storage tanks and the truck racks *in this proceeding*. Accepting the petitioners' argument would (1) undermine the finality of the 2007 decisions, (2) render general determinations regarding dedication to public use nearly useless when questions of scope are raised in later proceedings, and (3) expand judicially-created principles by requiring dedication findings to be made on an asset-by-assets basis.

In summary, the petitioners' attack on the Commission's interpretation and application of its 2007 dedication decision has not affirmatively demonstrated the Commission committed any of the errors listed in Public Utilities Code section 1757, subdivision (a).

Finally, the foregoing conclusions do not deprive businesses that are found to be operating public utilities of all remedies regarding the scope of assets included in the public utility. As observed by the Commission, businesses that wish to have certain assets excluded can file an application under Public Utilities Code section 851.

C.     Burden of Proof

The petitioners contend that the Commission impermissibly shifted the burden of proof to Pipeline Company by requiring it to disprove dedication of the truck racks and storage tanks. The petitioners begin their argument as follows:

> "Based upon its erroneous presumption of dedication, the Commission treated [Pipeline Company's] position on the private nature of the truck racks and storage tanks as a '*de facto* application for § 851 approval of the transfer out of public utility service.'"[15]  (Quoting Decision 11-05-026, conclusion of law No. 3.)

We need not analyze this argument regarding the burden of proof in detail because it is dependent upon the petitioners winning their claim of error regarding dedication to public use. Because they lost that issue, the foundation for their argument regarding the burden of proof is not present.

In other words, we conclude that the Commission properly shifted the burden of proof to the petitioners after it determined that the truck racks and storage tanks were covered by its earlier dedication decision and were necessary and useful to the operation of the public utility pipeline. In this matter, the Commission did not err when it concluded that the highly conclusory testimony of Smith that certain assets had been identified as noncarrier failed to carry that burden.

---

[15]     Public Utilities Code section 851 provides that a public utility or common carrier shall not transfer any part of its line, system or other property necessary or useful in the performance of its duties, without first securing an order from the Commission authorizing it to do so.

# DISPOSITION

The Commission's initial Decision 11-05-026 and rehearing Decision 12-02-038 are affirmed insofar as they concern the dedication of ancillary assets and have not been vacated by the Commission.  Respondent and real parties in interest shall recover their costs in this proceeding.  (Cal. Rules of Court, rule 8.493(a)(1)(A).)

_____

Franson, J.

WE CONCUR:


_____

Cornell, Acting P.J.


_____

Peña, J.