Filed 12/22/15

## CERTIFIED FOR PARTIAL PUBLICATION[*]

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SAN PABLO BAY PIPELINE COMPANY, LLC et al., | F069796 |
| Petitioners, | |
| v. | **OPINION** |
| PUBLIC UTILITIES COMMISSION, | |
| Respondent; | |
| TESORO REFINING & MARKETING COMPANY et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS; petition for writ of review of decision of the Public Utilities Commission of the State of California.

Goodin, MacBride, Squeri, Day & Lamprey, James D. Squeri, Megan Somogyi; Munger, Tolles & Olson, Fred A. Rowley, Jr., and Joshua Patashnik for Petitioners.

Karen Clopton, Helen W. Yee, Paul Angelopulo and Jonathan C. Koltz for Respondent.

---

[*]     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.

Manatt, Phelps & Phillips, David L. Huard and Benjamin G. Shatz for Real Party in Interest Tesoro Refining & Marketing Company.

Orrick, Herrington & Sutcliffe, Joseph M. Malkin and Eric M. Hairston for Real Party in Interest Chevron Products Company.

Pillsbury Winthrop Shaw Pittman, Kevin M. Fong and Michael S. Hindus for Real Party in Interest Valero Marketing and Supply Company.

-ooOoo-

In *San Pablo Bay Pipeline Co. LLC v. Public Utilities Com.* (2013) 221 Cal.App.4th 1436, this court confirmed a decision of the California Public Utilities Commission (the Commission or PUC) that certain truck racks and storage tanks were part of a pipeline subject to its jurisdiction as a public utility.  At the time, we deferred consideration of statute of limitations issues until the Commission filed a final decision on those issues and the related issue of the amount of money to be refunded to shippers that had used the pipeline.  (*Id*. at p. 1442.)

The Commission has rendered its decision and petitioner San Pablo Bay Pipeline Company, LLC (Pipeline Company) filed this writ proceeding to challenge the refund of approximately $104.3 million.  Pipeline Company contends the refund is too large because the Commission (1) erred in applying the statute of limitations and thus awarded refunds for too long of a period and (2) undervalued the costs Pipeline Company incurred for "line fill" oil used to help transport oil shipments through the pipeline.

The Commission argues that it has the authority to toll the two-year statute of limitations in Public Utilities Code section 735[1] and that section should not be interpreted as an absolute bar to every type of tolling.  We conclude that in the peculiar facts of this case, which was processed in a jurisdictional phase followed by a ratemaking and

---

[1]     All unlabeled statutory references are to the Public Utilities Code.

2.

reparations phase, the Commission had the authority to bifurcate the matter into two phases and to conclude the limitations period did not run during the first phase.

As to the Commission's decision to treat line fill as a capital asset valued at its original cost, we conclude Pipeline Company has failed to clearly establish the unreasonableness of the Commission's method of valuation.

Therefore, the Commission's decision is confirmed.

## FACTS AND PROCEEDINGS

### *The Parties*

Pipeline Company, a wholly owned subsidiary of Shell Oil Products US, owns and operates the pipeline in question and is the sole petitioner in this writ proceeding. Pipeline Company, as used in this opinion, includes the prior owner of the pipeline and other Shell affiliates.

The Commission is the only respondent. The three real parties in interest are (1) Chevron Products Company (Chevron); (2) Tesoro Refining & Marketing Company (Tesoro); and (3) Valero Marketing and Supply Company (Valero; collectively, "shippers"). The shippers paid Pipeline Company to transport crude oil by pipeline from Chevron's oil production fields to refineries operated by Tesoro and Valero.

### *The Pipeline*

The pipeline is a 20-inch heated crude oil pipeline that runs approximately 265 miles from oil fields in Kern County to the San Francisco Bay Area (SJV Pipeline). SJV Pipeline transports crude oil to (1) the Shell refinery in Martinez, California; (2) the Tesoro Golden Eagle refinery in Martinez, California; and (3) and the Valero refinery in Benicia, California. In 2011, the SJV Pipeline transported an average of 150,000 to 160,000 barrels per 24-hour period of continuous operations (i.e., per stream day). Approximately 50,000 barrels of this amount was delivered to shipper's Bay Area refineries, while the balance was delivered to the Shell refinery in Martinez. Further details regarding SJV Pipeline's characteristics and history are described in *San Pablo*

3.

*Bay Pipeline Co. LLC v. Public Utilities Com.*, *supra*, 221 Cal.App.4th at pages 1439 to 1440 and are not repeated here.

### Phase One of Proceedings

#### Chevron's Complaint

On December 5, 2005, Chevron filed its initial complaint with the Commission. The complaint was designated C.05-12-004. Chevron alleged that (1) the SJV Pipeline had been operated as a public utility since before 2005; (2) effective April 1, 2005, Pipeline Company increased the rates charged on Chevron's shipments from $1.08 to $1.686 per barrel; and (3) Pipeline Company overcharged and discriminated against nonaffiliated shippers in violation of California law.

Chevron alleged that it was obligated contractually to deliver crude oil to Tesoro at the Golden Eagle refinery and to Valero at its Benicia refinery. Chevron alleged that the SJV Pipeline, which is heated, was the only practical way to transport approximately 44,000 barrels per day of San Joaquin Valley heavy crude needed to meet its contractual obligations with Tesoro and Valero. This lack of practical alternatives meant that Pipeline Company was in a position to impose monopoly prices for the transportation services provided by the SJV Pipeline.

Chevron's complaint asked the Commission (1) to declare that the SJV Pipeline was a public utility subject to the Commission's jurisdiction and (2) to find that Pipeline Company had violated the Public Utilities Code by (a) failing to file tariffs for its pipeline services, (b) discriminating between its affiliates and other shippers in the rates charged, (c) charging unreasonable rates to nonaffiliated shippers, and (d) illegally changing its rates. Chevron's request for relief also asked the Commission to determine just and reasonable rates effective April 1, 2005, and to order Pipeline Company "to refund to Chevron the difference between the rates paid by Chevron from April 1, 2005 and the reasonable rates determined by the Commission."

*Tesoro's Intervention*

On December 13, 2005, Tesoro filed a petition to intervene in case C.05-12-004. Tesoro's petition alleged that it was dependent upon the SJV Pipeline because it was the only heated crude oil line from Bakersfield to its Golden Eagle refinery at Martinez and the only pipeline that could efficiently ship heavy viscous San Joaquin crude oil. Tesoro also alleged it had a substantial interest in the remedies sought by Chevron as the impact of the Pipeline Company's charges fell on it because the amount Tesoro paid to Chevron for the crude oil included those transportation charges. Tesoro supported the relief sought by Chevron and stated it did "not seek a broadening of the issues presented in the Complaint."

The addition of Tesoro to the proceeding did not change the volume of oil for which a refund was sought and Pipeline Company did not oppose Tesoro's petition to intervene. Consequently, the Commission granted Tesoro's request to intervene.

*Prehearing Procedures*

In March 2006, after a prehearing conference, the Commission bifurcated the proceeding, with the first phase limited to whether the SJV Pipeline was a public utility subject to the Commission's jurisdiction and the second phase, if necessary, to address all ratemaking and remedies. The scoping memo and ruling that established the two phases did not specify the precise procedural steps that would be used if a second phase was necessary.

Subsequently, the parties filed various motions designed to resolve the first phase of the proceeding. Pipeline Company filed a motion to dismiss and both sides filed motions for summary adjudication.

*2007 Decision*

In July 2007, the Commission resolved the pending motions by issuing Decision 07-07-040. The Commission denied Pipeline Company's motions and granted Chevron's motion for summary adjudication, concluding that the SJV Pipeline had been dedicated to

5.

public service and, thus, was subject to regulation by the Commission. The Commission also concluded that "this proceeding should be closed, effectively immediately." This conclusion may explain what was intended by the March 2006 scoping memo and ruling when it bifurcated the proceeding.

Pipeline Company requested a rehearing and, in response, the Commission issued Decision 07-12-021, which modified its prior decision. Among other things, Decision 07-12-021 expanded the earlier order by including a paragraph that directed Pipeline Company "to file tariffs for its third party contracts." The new decision also stated, "This proceeding, Case (C.) 05-12-004, is closed."

### Judicial Review of 2007 Decision

Pipeline Company's attempts to have the decision, as modified, overturned in court were unsuccessful. The Second Appellate District of the Court of Appeal denied its petition for writ of review in June 2008 and, two months later, the California Supreme Court denied a petition for review. Consequently, the Commission's decision that the SJV Pipeline had been dedicated to public use and its order directing Pipeline Company to file a tariff became a final decision no longer subject to challenge in administrative or judicial proceedings.

## Phase Two of Proceedings

### New Pleadings—Complaint and Tariff Application

On March 26, 2008, well before Pipeline Company's judicial challenges to the Commission's modified decision were rejected by the California Supreme Court in August 2008, Chevron initiated the second phase of the proceedings by filing another complaint with the Commission, Case C.08-03-021.

Chevron's complaint alleged the Commission's modified decision held Pipeline Company was operating the SJV Pipeline as a public utility and, since at least April 1, 2005, Pipeline Company had not filed tariffs setting rates for services on the SJV Pipeline as required by law. The second complaint repeated verbatim Chevron's request in its

6.

prior complaint for the Commission to determine just and reasonable rates for transportation of crude oil on the SJV Pipeline effective April 1, 2005, and to order Pipeline Company "to refund to Chevron the difference between the rates paid by Chevron from April 1, 2005 and the reasonable rates determined by the Commission."

About six months later, in September 2008, Pipeline Company filed an application proposing a tariff for the SJV Pipeline, which the Commission designated Application 08-09-024.

### *Consolidation of Complaints and Tariff Application*

On February 13, 2009, Chevron and Pipeline Company filed a joint motion to consolidate Pipeline Company's tariff application with Case C.08-03-021. Pipeline Company's tariff application sought to establish forward-looking just and reasonable rates, while Chevron's refund claim was backward-looking in that it addressed charges paid during the period from April 1, 2005, until the effective date of the approved tariff. The joint motion stated that "the just and reasonable rate for the past period may very well be different from the just and reasonable tariff rate," but asserted the cases involved similar legal issues and much of the same evidence. The joint motion also stated that Chevron's amended complaint eliminated Chevron's request for penalties and, therefore, "both cases will be categorized as ratesetting."

Also on February 13, 2009, Tesoro filed a complaint with the Commission that was similar to Chevron's March 2008 complaint in that it sought a refund equal to the difference between what Tesoro paid to ship crude oil and the reasonable rates determined by the Commission.

On March 23, 2009, Valero also filed a complaint seeking a refund of overcharges. The Commission designated the proceedings relating to the complaints filed by Chevron, Tesoro and Valero as Case 08-03-021, Case 09-02-007 and Case 09-03-027, respectively.

7.

*Prehearing Procedures*

In April 2009, the Commission filed a scoping memo and ruling that addressed the motion to consolidate Pipeline Company's pending tariff application with the three refund complaints. The Commission directed that the four matters be consolidated as a ratesetting proceeding, stating:

> "This proposal [to consolidate as a ratesetting proceeding] was received positively by counsel for all parties. In order to facilitate this global approach, Chevron and Tesoro have refiled their complaint cases as refund claims and Valero has filed a similar refund claim. All three of these cases are preliminarily classified as adjudicatory."[2]

The scoping memo enumerated 10 issues that were appropriate for resolution in the consolidated proceeding, including (1) the just and reasonable rates, terms and conditions for public utility service on the SJV Pipeline during the period from April 1, 2005, through the effective date of the approved tariffs and (2) the refunds, if any, to the shippers for unjust and unreasonable rates imposed during that period.

The scoping memo also established a schedule for (1) the submission of written evidence by the parties, (2) an evidentiary hearing, (3) the filing of concurrent opening and reply briefs, (4) the issuance of a proposed decision, and (5) the parties' comments and replies to comments on the proposed decision. The schedule left open the date for the final decision.

*2011 Decision*

In June 2011, after the scheduled steps were completed, the Commission issued Decision 11-05-026. The decision (1) set rates at $1.34 per barrel, (2) adopted tariff provisions to govern the sale of transportation services on the SJV Pipeline, and (3) ordered the payment of refunds to the shippers for overcharges made from April 1, 2005, to the effective date of the decision.

---

**2** Over five years later, in Decision 14-06-052, the Commission stated the consolidation of the four matters was "in conformance with the intent behind our bifurcation ruling."

The Commission found the just and reasonable rate for transportation of crude oil on the SJV Pipeline from April 1, 2005, through December 31, 2005, to be $1.23 per barrel. The Commission also found the just and reasonable rate for the period from January 1, 2006, through the effective date of the tariff to be $1.246 per barrel. These rates were the rates Pipeline Company charged to a Shell affiliate during those periods.

Decision 11-05-026 addressed the appropriate refund period by noting that at the time of consolidation of the refund cases with the rate setting case, "all parties including [Pipeline Company] treated April 1, 2005 as the earliest date from which refunds could be sought." Rejecting Pipeline Company's position that the refund period began on August 1, 2007 (the effective date of Decision 07-07-040), the Commission found the refund period started on April 1, 2005, and ran until the approved tariff when into effect.

*Application for Rehearing*

In July 2011, Pipeline Company filed an application for a rehearing of Decision 11-05-026 that asserted a "myriad [of] legal errors" occurred in the Commission's decision setting rates, approving the tariff, and awarding refunds. Pipeline Company argued that the Commission exceeded its jurisdiction and failed to proceed as required by law by awarding refunds (1) for a period prior to its July 2007 finding the SJV Pipeline was subject to its jurisdiction and (2) for a period before the two-year statute of limitations set forth in section 735.

*2012 Decision*

In February 2012, the Commission issued Decision 12-02-038, which modified its prior decision and granted a rehearing on the sole issue of how to calculate the refunds. Decision 12-02-038 stated that the Commission correctly found the refund period commenced on April 1, 2005, because (1) the three-year statute of limitations in section 736 applied, (2) Pipeline Company waived its right to object to the start date of April 1, 2005, and (3) the statute of limitations was equitably tolled by the filing and pendency of Chevron's original complaint.

9.

*Petition for Judicial Review and Application to PUC for a Rehearing*

In March 2012, Pipeline Company filed a petition for writ of review in this court to challenge Decision 11-05-026 and the modification implemented by Decision 12-02-038.

Three days later, the shippers challenged the Commission's grant of a limited rehearing as to the refund calculation by filing an application for rehearing of Decision 12-02-038. As a result of Pipeline Company's petition for writ review and the shippers' application for rehearing, Decision 21-02-038 was subject to an administrative challenge and a judicial proceeding at the same time.

In April 2012, the Commission granted a limited rehearing of Decision 12-02-038 on all issues related to the refund calculations. Because the issues related to the statute of limitations were intertwined with the calculation of the refund, the Commission vacated its earlier determinations regarding the statute of limitations, stating its belief that "all matters related to the refund should be considered together."

In May 2012, the Commission requested this court to dismiss the issues in Pipeline Company's petition involving the statute of limitations. The Commission, having vacated its analysis and conclusions regarding the statute of limitations issues, believed it should not be required to defend the vacated portions of its decisions in the writ proceeding before this court. We granted the Commission's motion to dismiss in an order dated October 31, 2013, and explicitly stated that the order was without prejudice to the right of any party to challenge the Commission's final determination of the refund and statute of limitations issues.

In accordance with the Commission's grant of a limited rehearing, the Commission received written evidence, testimony and further briefing during 2012.

*2013 Decision*

In May 2013, the Commission issued Decision 13-05-017, reiterating its conclusion that refunds were owed back to April 1, 2005. In support of this conclusion,

the Commission found that Pipeline Company was an advocate, benefactor and cause of the delay in considering the shippers' refund claims and also found:

> "21.   All the complaints raised the same material factual and legal issues, and asked for the same relief, as Chevron's 2005 complaint.  There is no significant factual distinction, and no legal distinction between the refund claims of Tesoro, Valero and Chevron.  All three shippers were subject to the same illegal and discriminatory transportation overcharges for the same period of years."

> "22.   Our bifurcation ruling temporarily deprived [shippers] of a forum in which to pursue their refund claims until [Pipeline Company] filed its ratesetting application."

The Commission's conclusions of law referenced the Commission's broad authority under the California Constitution and Public Utilities Code and then addressed the bifurcation ruling:

> "For reasons of administrative practicality, responding to the parties' requests, and to ensure due process, the Commission lawfully bifurcated the complaint proceeding into two phases, and properly ordered the filing of a ratemaking application.  [¶]  … Our constitutional and statutory authority permitted us to bifurcate the proceedings, and thus, toll the statute of limitations during the period in which the Commission and the appellate courts investigated whether the pipeline was subject to Commission jurisdiction, from December 5, 2005 through August 20, 2008."

As to the calculation of the refund, the Commission determined it appropriate to apply a single refund rate to the entire refund period[3] based on the 2006 cost of service and 2006 throughput.  The Commission also determined that "[t]he refund rate should be calculated using 2006 actual historical data" and found the just and reasonable refund rate was $1.2450 per barrel.  The Commission rejected Pipeline Company's "proposal to adjust the base rate for actual volumes and the variable value of line fill based on fluctuating oil prices."  The Commission found the accepted methodology for valuing

---

**3**      The refund period began on April 1, 2005, and ended on June 30, 2011, the effective date of Pipeline Company's initial tariff.

line fill, like "line pack" and "cushion gas" in natural gas cases, was to use its original cost as part of the rate base on which the pipeline earns a rate of return.

Based on these determinations, the Commission concluded that Pipeline Company owed "refunds to Chevron, Tesoro and Valero in the sum of $104,291,585, plus interest." In addition, the Commission adopted $1.34 per barrel as the going-forward rate.

*2014 Decision—Final Administrative Decision*

Pipeline Company filed an application for rehearing of Decision 13-05-017 and, in June 2014, the Commission issued Decision 14-06-052, which modified the earlier decision and denied the application for a rehearing. As to the statute of limitations issue, Decision 14-06-052 added the following finding of fact: "The Commission limited the scope of the Phase 1 proceeding to the issue of our jurisdiction over the Pipeline, and all parties agreed that the refund claims should be part of Phase 2, and not Phase 1." In addition, the Commission concluded the closing of C.05-12-004 without addressing the refund claim "had no effect on the continuing relevance of the 2005 refund claims in Phase 2."

*Petition for Writ of Review*

The issuance of Decision 14-06-052 meant that the Commission's order regarding the amount of the refund became final for administrative purposes (i.e., there were no more administrative remedies to exhaust) and could be challenged in court by way of a petition for writ of review.

In July 2014, Pipeline Company filed such a petition for writ of review, asserting errors in the Commission's (1) statute of limitations analysis and (2) treatment of "line fill" costs bearing on the amount of the refunds.

12.

**DISCUSSION**

I.      THE COMMISSION AND ITS DECISIONS

      A.      <u>The Nature of the Commission and Its Authority</u>

The Commission is a state agency of constitutional origin with far-reaching duties, functions and powers. (Cal. Const., art. XII, §§ 1–6.) The California Constitution granted broad authority to the Commission to regulate utilities, including the power to fix rates for the transportation of passengers and property, establish rules, hold hearings, and award reparations. (Cal. Const., art. XII, §§ 4, 6; see *Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256, 264 (*Hartwell*).) In addition, "[s]ubject to statute and due process, the commission may establish its own procedures." (Cal. Const., art. XII, § 2.)

The California Constitution also grants the Legislature broad power to regulate public utilities and to delegate regulatory functions to the Commission. (Cal. Const., art. XII, §§ 3, 5; see *Hartwell*, *supra*, 27 Cal.4th at pp. 264–265.) Pursuant to these constitutional provisions, "the Legislature has granted the [Commission] comprehensive jurisdiction to regulate the operation and safety of public utilities. (§§ 701, 761, 768, 770, subd. (a).)" (*Hartwell*, *supra*, 27 Cal.4th at p. 265.) The most fundamental of these legislative grants of authority is section 701, which provides:

> "The Commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction."

This legislative grant of authority is "expansive" and has been liberally construed. (*Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 905, disagreed with on another point in *Kowis v. Howard* (1992) 3 Cal.4th 888, 897, fn. 2.)

B.     Judicial Review by Writ

The California Constitution provides plenary power to the Legislature "to establish the manner and scope of review of commission action in a court of record .…" (Cal. Const., art. XII, § 5.) Pursuant to this provision, the Legislature has authorized only the California Supreme Court and the Court of Appeal to review orders and decisions of the Commission. (§ 1759, subd. (a).)

The procedural mechanism by which a party may challenge a decision by the Commission is a petition for writ of review filed in the Court of Appeal. (§ 1756, subd. (a).) Certain procedural requirements must be satisfied before an aggrieved party may file its petition for writ of review. (See §§ 1756, subd. (a) [application for rehearing], 1732 [specification of grounds].) Here, Pipeline Company had satisfied the procedural requirements and, therefore, the merits of its writ petition are properly before this court.

Petitions for a writ of review function as appeals from the administrative decisions of the Commission and are the exclusive means of judicial review of such decisions. Consequently, an appellate court should not deny the petition on policy grounds unrelated to the merits. (*The Ponderosa Telephone Co. v. Public Utilities Com.* (2011) 197 Cal.App.4th 48, 56.) Based on this principle, we will address the merits of Pipeline Company's petition for writ of review.

C.     Scope and Standards of Review

*1.     Basic Principles*

Judicial review of Commission decisions is relatively narrow. For instance, the appellate court may not consider new or additional evidence and may not exercise independent judgment on the evidence. (§ 1757, subds. (a) & (b).) Also, reviewable issues are limited to whether the Commission (1) acted without, or in excess of, its jurisdiction; (2) proceeded in the manner required by law; (3) issued a decision not supported by the findings; (4) made findings not supported by substantial evidence in

14.

light of the whole record; (5) abused its discretion; or (6) violated a constitutional right. (§ 1757, subd. (a).)

The foregoing constitutional and statutory provisions are the foundation for the well-established principle that there is a strong presumption of validity of the Commission's decisions. (*Greyhound Lines, Inc. v. Public Utilities Com.* (1968) 68 Cal.2d 406, 410 (*Greyhound*); *Clean Energy Fuels Corp. v. Public Utilities Com.* (2014) 227 Cal.App.4th 641, 649.)

### 2. *Statutory Interpretation*

Another aspect of the deference given to the Commission's decision is the principle that the Commission's interpretation of the Public Utility Code should be accepted "unless it fails to bear a reasonable relation to statutory purposes and language …." (*Greyhound*, *supra*, 68 Cal.2d at pp. 410–411.) This deference is based on the idea that the Commission has a special familiarity and expertise with the satellite legal and regulatory issues that informs its interpretation of the statutory provision in question. (*Southern California Edison Co. v. Public Utilities Com.* (2014) 227 Cal.App.4th 172, 185.) An exception to the general rule of deference to the Commission's statutory interpretations applies when the issue is the scope of the Commission's jurisdiction. (*Ibid.*)

### 3. *Prejudice*

A final aspect of judicial review relates to the element of prejudice. Courts will annul a decision by the Commission only if the error demonstrated by the aggrieved party was prejudicial. (*The Utility Reform Network v. Public Utilities Com.* (2014) 223 Cal.App.4th 945, 958.)

## II. PHASED PROCEEDINGS AND THE STATUTE OF LIMITATIONS

Pipeline Company's challenge to the Commission's analysis of the statute of limitations issue is based on (1) the text of section 735 and (2) the application of that

provision's two-year limitations period to the complaints filed in the second phase of the proceedings before the Commission.

In contrast, the Commission takes a much broader view of the issues presented, arguing that (1) the first phase of the proceedings is relevant because it was started less than nine months after April 1, 2005; (2) it had the authority to adopt the two-phase procedure used in this matter; and (3) it had the authority to consider the statute of limitations tolled during the first phase of the proceedings. The Commission asserts: "There is no legitimate dispute that Phase 2 was a continuation of Phase 1, as both the rate case and the complaint cases could only move forward after jurisdiction was established in Phase 1."

A.      Section 735

We assume for purposes of discussion that section 735 is the statute of limitations that applies to the refund claims presented by the shippers. Section 735 provides in relevant part:

> "All complaints for damages resulting from a violation of any of the
> provisions of [the Public Utilities Act], except Sections 494 and 532, shall
> … be filed with the commission, … within two years from the time the
> cause of action accrues, and not after."[4]

Pipeline Company contends the Legislature's use of phrase "shall … be filed" in conjunction with "and not after" demonstrates a clear legislative intent to prohibit any extension of the two-year period, whether by tolling or other means. This argument about legislative intent is based on cases that existed at the time the statute's predecessors

---

[4]      We have assumed that section 735 (and not the exception) applies because no tariff schedules were in place during the period for which refund is sought. The exception in section 735 for violations of sections 494 and 532, which are covered by the three-year limitations period set forth in section 736, the statute of limitations that the shippers contend applies in this case. Section 494 prohibits *common carriers* from assessing charges not specified in its *schedules* filed and in effect at the time. Section 532 states that no *public utility* shall charge rates, tolls or rentals other than those in its *schedules* on file and in effect at the time.

16.

were enacted and the principle that the Legislature is deemed aware of existing decisions and to have adopted the meaning of statutory terms already construed. (*People v. Scott* (2014) 58 Cal.4th 1415, 1424.)

### 1. Cases Addressing Similar Text

Pipeline Company cites *Phillips v. Grand Trunk Ry.* (1915) 236 U.S. 662 (*Phillips*), which addresses the meaning of a federal statute that provided "'all complaints for the recovery of damages shall be filed with the [Interstate Commerce] Commission within two years from the time the cause of action accrues, and not after .…'" (*Id*. at p. 666.) The court stated that the statute indicated "its purpose to prevent suits on delayed claims, by the provision that all complaints for damages should be filed within two years *and not after*. Under such a statute the lapse of time not only bars the remedy but destroys the liability [citation] .…" (*Id*. at p. 667; see *Cunningham v. Hawkins* (1864) 24 Cal. 403, 410–411 (*Cunningham*).) The court adopted this construction and rejected any implied or express waiver of the limitations period by the carrier because of the uniformity required by the statute in question and allowing a carrier to waive the statute as to some shippers and assert it against others would result in discrimination among shippers of the type forbidden by the statute. (*Phillips*, *supra*, at p. 667.)

Pipeline Company also cites a decision by the California Railroad Commission (predecessor of the PUC) that interpreted a predecessor to section 735 that provided a suit "'shall be filed'" within two years of accrual of the cause of action. (*James Mills Sacramento Valley Orchard & Citrus Fruit Co. v. Southern Pacific Co.* (1916) 9 C.R.C. 80, 82 (*James Mills*).) The California Railroad Commission relied on *Phillips*, even though the predecessor to section 735 did not contain the phrase "and not after." (*James Mills*, *supra*, at pp. 82–83.) It construed the statute to mean that all complaints concerning excessive or discriminatory charges must be filed with it within two years from the time the cause of action accrues. The California Railroad Commission stated

17.

that the statute made no exception and no provision allowing further time in the case of fraud. (*Id*. at p. 83.) It also concluded the carrier could not waive the statute of limitations defense. (*Ibid*.)

Based on this decision and the fact that the Legislature added the phrase "and not after" to a predecessor of section 735 in 1931, Pipeline Company argues the Legislature clearly intended that (1) there be no exceptions or other delays in the running of the two-year period and (2) liability be destroyed after the lapse of two years. (See Stats. 1931, ch. 806, § 1, p. 1687.)

The Commission cites *Toward Utility Rate Normalization, Inc. v. Pacific Bell* (1994) 54 Cal. P.U.C.2d 122 [1994 Cal.P.U.C. Lexis 313, 8] as an example of a case in which the Commission interpreted the statute of limitations in section 736 to be tolled until the plaintiff discovers the facts essential to the cause of action. As section 736 also uses the phrases "shall … be filed" along with "and not after," the Commission argues those two phrases do not create an absolute prohibition against tolling.

### 2. Application of Prior Decisions

The foregoing cases are useful in normal situations where only one complaint is filed. However, none of the cases cited by the parties involved facts similar to those presented in this case. The facts of legal significance that render the instant case unique are (1) the timely filing of an initial complaint seeking the same refund sought in the second phase, (2) the bifurcation of the proceedings with the agreement of the parties, (3) the unusual procedural device of an administratively final decision to conclude the first (i.e., jurisdictional) phase, and (4) the equally unusual procedural device of initiating the second phase (i.e., restarting the proceedings) by the filing of new complaints and a ratemaking application. We regard these facts as legally significant because they affect the public policies underlying the statute of limitations applicable to complaints filed with the Commission—namely, giving timely notice of claims to the defendant, giving

18.

stability to transactions, protecting settled expectations, promoting diligence, and preventing the statute of limitations from becoming a tool for discrimination among users of a public utility. (See generally *Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 499; *Phillips*, *supra*, 236 U.S. at p. 667.)

Based on the unique facts of this case and the policies underlying the statute of limitations, we conclude that cases such as *Phillips*, *Cunningham,* and *James Mills* are not controlling. The facts of this case put it into a category by itself.

B.     Authority for the Two-Phased Proceedings

We conclude the proper analysis in this case is to consider the proceedings in their entirety and determine whether the Commission had the authority to (1) conduct the proceedings in two phases and (2) apply the statute of limitations as though there was a single proceeding initiated in December 2005. We conclude the Commission had the authority to do both.

*1.     Authority to Bifurcate*

The authority to divide a proceeding into a jurisdictional phase and a ratemaking and reparations phase is not expressly granted to the Commission by the constitution or statute and has not been recognized in a published decision. Consequently, we consider whether the general grants of authority to the Commission are broad enough to authorize such a procedure.

The Commission relies on both constitutional and statutory provisions addressing its authority and notes the parties agreed to the bifurcation of the jurisdictional issues. Article XII, section 2 of the California Constitution provides that "[s]ubject to statute and due process, the commission may establish its own procedures." Section 701 states the Commission may do all things necessary and convenient in the exercise of its power to regulate public utilities.

First, the constitutional provision allowing the Commission to "establish its own procedures" does not require those procedures to be adopted pursuant to the Administrative Procedure Act (Gov. Code, § 11340 et seq.) or even to be adopted in writing. (Cal. Const., art. XII, § 2.) Therefore, we interpret the Commission's constitutional authority to "establish its own procedures" to mean the Commission is authorized to employ unwritten procedures on a case-by-case basis provided that those procedures do not contradict a statute and are consistent with the requirements of due process.

Second, we interpret the Commission's constitutional authority to "establish its own procedures" to encompass the bifurcation of the initial case because bifurcation (i.e., the use of two phases) is a procedural mechanism. (Cf. Fam. Code, § 2337 [early and separate trial for certain issues in dissolution of marriage proceeding]; Cal. Rules of Court, rule 5.390 [bifurcation of issues]; see Fam. Code, § 2025 [certification of bifurcated issue for appeal].)

Third, the Commission's use of bifurcation in this case did not offend the constitutional limitations relating to statutes and due process. Pipeline Company has cited, and we have located, no statute that prevents the bifurcation of a case into two phases. Also, the requirements of procedural due process were met in this case because (1) the parties agreed to the bifurcation of the proceeding and (2) the Commission explicitly found Pipeline Company advocated and benefited from the bifurcation of the proceedings.[5] Thus, the parties had notice and an opportunity to be heard on the question of bifurcation. (*Traverso v. People ex rel. Dept. of Transportation* (1993) 6 Cal.4th 1152,

---

[5] It appears the benefit to Pipeline Company was the opportunity to seek judicial review of the vigorously contested jurisdictional issue before investing time and money in the second phase of the proceedings. Pipeline Company took advantage of this opportunity, though it was unsuccessful when, on August 20, 2008, the Supreme Court declined to review the Second Appellate District's denial of Pipeline Company's writ petition.

20.

1169 ["procedural due process requires, at a minimum, notice and an opportunity to be heard"].)

In summary, we conclude the Commission correctly decided it had "lawfully bifurcated the complaint proceeding into two phases" and its "constitutional and statutory authority permitted [it] to bifurcate the proceedings .…"

2.    *Legal Authority to Toll the Statute of Limitations*

The Commission also concluded its constitutional and statutory authority permitted it to "toll the statute of limitations during the period in which the Commission and the appellate courts investigated whether the pipeline was subject to Commission jurisdiction, from December 5, 2005 through August 20, 2008."

The first step of our analysis is to frame the question presented. Framing the question is a significant step because it defines the specific power exercised by the Commission and, thus, our inquiry into the source of that power.

We will assume for purposes of discussion that section 735 applies and should be interpreted so that the lapse of the two-year period "destroys the liability" for unreasonable rates charged more than two years before the filing of the complaint. (See *Phillips*, *supra*, 236 U.S. at p. 667.) These two assumptions narrow the issue presented in this case and are consistent with the Commission's view that its power to toll the statute of limitations does not require the resurrection of liability previously destroyed. Therefore, we conclude the limited question presented in this case relates to the Commission's authority over how the statute of limitations should be applied *after the bifurcation order*. The specific issue presented is whether the Commission has the authority to bifurcate the proceedings and prevent the restarting of the statute of limitations during the remainder of the proceedings that occurred after the bifurcation.

This narrow framing of the issue is appropriate under the facts of this case because the timely filing of the December 2005 complaint gave the Commission jurisdiction over

21.

the cause of action for refunds on shipments made after April 1, 2005, and, at the time of filing, none of the liability for the post-March 2005 shipments had been destroyed by the lapse of time. We regard the distinction between (1) the power to resurrect destroyed liability and (2) the power to treat the bifurcation mechanism as preventing the restarting of the statute of limitations as critical to the proper framing of the issue presented in this case.[6] (See pt. II.A.2., *ante*.)

Our examination of the Commission's authority to prevent the restarting of the statute of limitations takes the same basic steps as our analysis of its authority to bifurcate a proceeding into two phases. (See pt. II.B.1., *ante*.) First, the parties have not cited, and we have not located, any constitutional provision, statute or published authority that explicitly addresses the power of the Commission to control the statute of limitations during the course of a bifurcated proceeding. Second, in the absence of specific authority, we turn to the sources of the Commission's general authority. The California Constitution provides the Commission with the authority to establish its own procedure and section 701 states the Commission "may do all things … necessary and convenient in the exercise of [its] power" to supervise and regulate public utilities. This statutory authority is expansive and should be liberally construed. (See pt. I.A., *ante*.)

Based on the expansive nature of the Commission's authority under section 701, we conclude the Commission has the authority to control the running of the statute of limitations during the course of a bifurcated proceeding, provided that the first phase was initiated by a timely filed complaint and the parties agreed to the bifurcation of the proceedings. Therefore, the Commission had the power to prevent the restarting or lapsing of the statute of limitations during the first phase of a bifurcated proceeding.

---

[6] The Commission's power to halt the restarting of the statutory period after the filing of a timely complaint can also be described as (1) the power to toll the statutory period *during* bifurcated proceedings conducted after the filing of a timely complaint or (2) the power to determine when and how the statutory period runs or lapses *during* a bifurcated proceeding.

22.

Pipeline Company's reliance on cases stating that claims based on pre-limitations conduct are barred and extinguished is misplaced. Those cases did not involve a timely filed complaint that was timely as to all claims and the bifurcation of proceedings relating to those claims into two phases.

### 3. Equitable Power Authority to Toll the Statute of Limitations

The Commission also concluded that its *equitable* powers allowed it to apply equitable principles to toll the statute of limitations and section 735 did not prohibit the exercise of its equitable powers under the facts of this case.

Section 701 and the constitutional provisions do not expressly state that the Commission has equitable powers. The California Supreme Court has recognized that the Commission "possesses equitable power to award attorney fees under the common fund doctrine in quasi-judicial reparation actions." (*Consumers Lobby Against Monopolies v. Public Utilities Com.*, *supra*, 25 Cal.3d at p. 908.) From this holding relating to attorney fees, we infer that, in general, the Commission has equitable power when it is performing judicial functions.

Based on this general authority relating to equitable power, the Commission's constitutional authority to establish its own procedures, and the unique facts presented by the bifurcation of the proceeding into two phases, we conclude that the Commission has the equitable power to apply equitable tolling or equitable estoppel *in the limited circumstances of this case*. (See *Hopkins v. Kedzierski* (2014) 225 Cal.App.4th 736, 755 [doctrines of equitable tolling and equitable estoppel are distinct].) We do not address the question whether the Commission's authority to apply the doctrine of equitable tolling or estoppel extends beyond the context of a bifurcated proceeding initiated with a timely complaint.

The three elements of equitable tolling are (1) timely notice of the claim to the defendant, (2) lack of prejudice to the defendant, and (3) reasonable and good faith

23.

conduct by the claimant. (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 102.) These three elements have been satisfied in this case. First, the initial complaint filed in December 2005 timely notified Pipeline Company that a refund of overcharges was being sought for the period beginning April 1, 2005. Second, there was no prejudice to Pipeline Company because the claims in the second phase are identical to those raised in the initial complaint and, as a result, Pipeline Company was alerted to the need to begin investigating the facts that formed the basis of the refund claim. (*Id*. at p. 102, fn. 2.) Third, shippers acted in accordance with the bifurcation or two-phase procedure ordered by the Commission and, therefore, demonstrated the requisite reasonableness and subjective good faith. Therefore, the three general elements of equitable tolling were satisfied in this case.

As with our discussion of the Commission's legal authority to toll or prevent the lapse of the limitations period during bifurcated proceedings, we note that the equitable tolling applied in this case is extremely narrow because the December 2005 complaint that gave Pipeline Company timely notice of the claim initiated the proceedings that ultimately resulted in the refunds being ordered. Therefore, this is not a situation where equitable tolling was applied to resurrect liability that was destroyed by the lapse of two years before the filing of any complaint. Instead, this is a case where the means adopted to allow judicial review of the jurisdictional question could have been accomplished by other procedural devices that would have avoided the statute of limitations question and the choice of procedures should not be used to truncate the shipper's refund period when the policies underlying the statute of limitations were satisfied by the initial complaint.[7]

_____

[7] The Commission chose to analyze the statute of limitations issue using the concept of tolling. Alternatively, the Commission could have focused on section 735's use of the word "complaints" and interpreted it so that the complaints filed in the second phase were deemed to be subsumed by the initial complaint filed in December 2005. This approach is suggested by the Commission's answer, which asserts "that Phase 2 was a continuation of Phase 1." In other words, the documents labeled "complaints" that were filed to initiate Phase 2 were not "complaints" for purposes of section 735 and, as a result, the two phases should be treated as a

24.

Given the deference that courts give to the Commission's interpretation of the Public Utilities Act, the foregoing approach to identifying the relevant complaint may have justified the Commission's conclusion that the claims for refunds on shipments going back to April 1, 2005, were timely under section 735.

In summary, we conclude the Commission did not act in excess of its jurisdiction or authority or contrary to law when it awarded refunds for shipments made on or after April 1, 2005.

## III.  LINE FILL AND COST OF SERVICE[*]

### A.  Background

#### 1.  Cost-of-Service Methodology

Generally, the Commission calculates what constitutes permissible utility rates by determining (1) a test period for the costs and expenses that can be attributed to providing the service, (2) the rate base of the utility—that is, the value of the property devoted to public use—and (3) a reasonable rate of return to be allowed the utility company on its rate base.  (*City & County of San Francisco v. Public Utilities Com.* (1971) 6 Cal.3d 119, 122; see *SFPP, L.P. v. Public Utilities Com.* (2013) 217 Cal.App.4th 784, 801 [a public utility is entitled to a reasonable return on the value of the assets it employs to provide utility service—i.e., its rate base].)

In this case, the Commission used the cost-of-service methodology to (1) determine the rates that Pipeline Company began charging on April 1, 2005, were unjust and unreasonable and (2) calculate the $104.3 million in refunds owed to the shippers.

---

single case initiated for statute of limitations purposes by the filing of the December 2005 complaint.

[*]  See footnote, *ante*, page 1.

Pipeline Company accepts the use of the cost-of-service methodology for determining just and reasonable rates for the refund period, but challenges how the Commission calculated the cost of one item in the rate base—namely, line fill.  The parties agree that Pipeline Company is entitled to a return on its investment in line fill, but disagreed on how to determine the value of the investment in line fill.

>2.>*Line Fill*

"Line fill" is defined by Pipeline Company as the quantity of oil in the system required to keep the crude oil moving and make prompt, continuous deliveries.  The Commission describes line fill as "the oil used in the pipe to maintain pressure."  The shippers refer to line fill as the oil inside the pipes that maintains pressure and pushes other oil through the pipeline, stating it is necessary for the pipeline to function.

An online dictionary defines line fill as the amount of oil required to fill a new line before deliveries can be made at the end of the line and defines line pack as the barrels of oil maintained in a trunk pipeline at all times to maintain pressure and provide an uninterrupted flow of oil.  (<http://dictionary.babylon.com/line _fill_and_line_ pack> [as of Dec. 22, 2015].)

The foregoing definitions are descriptive and do not suggest how to categorize line fill for accounting purposes or how to determine its value under a cost-of-service methodology.

>B.>Contentions

The Commission treated the line fill used in the SJV Pipeline as a fixed asset and valued it at its 1996 cost.  The Commission used 1996 based on (1) its conclusion that the SJV Pipeline was dedicated to public use and thus subject to its jurisdiction since at least 1996 and (2) Pipeline Company's failure to submit data as to when it originally provided line fill.

26.

*1.    Pipeline Company's Position*

Pipeline Company contends the Commission erred in its analysis of line fill, which understated its costs and overstated the shippers' refunds. Pipeline Company asserts that (1) every batch of crude oil is pushed down the pipeline by batches loaded after it; (2) the operation of a pipeline requires line fill to keep oil in the system moving; (3) line fill is replaced continuously with new oil as the batches in the pipeline are delivered; and (4) the process of continual replacement every three or four days means that the cost of providing line fill fluctuates with the price of crude oil. Based on these assertions of fact, Pipeline Company contends line fill should have been treated as a component of working capital and valued at its actual cost. If the line fill had been valued at replacement cost, it would have been valued substantially higher than the January 1996 price of $13.75 per barrel. For example, crude oil prices were over $50 per barrel in January 2006 and over $120 per barrel in June and July 2008.

*2.    Commission's Contentions*

The Commission argues that (1) it has wide latitude in choosing the methods employed in ratemaking and acted reasonably in choosing to value line fill as a capital asset rather than inventory; (2) its findings of fact are supported by substantial evidence; and (3) the federal regulations are not binding on it and are not the only reasonable accounting method for line fill.

C.    <u>Rules of Law Governing Ratemaking and Reparations</u>

Section 451 provides that all charges received by any public utility for any service rendered "shall be just and reasonable. Every unjust and unreasonable charge demanded or received for such … service is unlawful."

When section 451 has been violated, the Commission is authorized to order reparations. In particular, section 734 provides that when the Commission has found a public utility has charged unreasonable, excessive or discriminatory rates for the

performance of a service, the Commission "may order that the public utility make due reparation to the complainant therefor, with interest from the date of collection if no discrimination will result from that reparation."

The parties have cited no statutory provision specifying the method or criteria the Commission is required to employ when determining whether charges are just and reasonable. In recognition of the absence of statutory guidance, the Commission cites the California Supreme Court for the proposition that its determination of reasonable rates and charges is presumed correct and it "may choose its own criteria or method of arriving at it decision, even if irregular, provided unreasonableness is not 'clearly established.'" (*Pacific Tel. & Tel. Co. v. Public Util. Com.* (1965) 62 Cal.2d 634, 647.)

Pipeline Company has not acknowledged this Supreme Court precedent and its burden of clearly establishing the unreasonableness of the Commission's choosing to treat line fill as a fixed capital asset valued at its 1996 costs. Instead, Pipeline Company contends: "In their Answers, neither the Commission nor the Shippers provide any legal or factual justification for the Commission's method of valuation [of line fill], which conflicts with the Commission's own prior ratemaking determinations."

This contention suggests Pipeline Company believes that the Commission's prior decisions create binding precedent. This view of Commission decisions has not been adopted by our Supreme Court:

> "The departure by the Commission from its own precedent or its failure to observe a rule ordinarily respected by it is made the subject of criticism [by petitioner], but our reply is that this is not a matter under the control of this court. We do not perceive that such a matter either tends to show that the Commission had not regularly pursued its authority, or that said departure violated any right of the petitioner guaranteed by the state or federal constitution. Circumstances peculiar to a given situation may justify such a departure." (*Postal Tel.-Cable Co. v. Railroad Com.* (1925) 197 Cal. 426, 436–437.)

The Commission has relied on this statement by the Supreme Court in setting forth the following description of its authority:

> "The Commission may legally depart from its 'own precedent' or may fail to 'observe a rule ordinarily respected by it,' so long as '[c]ircumstances peculiar to a given situation may justify such a departure.' (*Postal Tel.-Cable Co. v. Railroad Com.*[, *supra*,] 197 Cal. 426, 436–437.)  Thus, when the circumstances warrant it, the Commission may adopt an exception to the general rule." (*Toward Utility Rate Normalization* (1993) 52 Cal.P.U.C.2d 673 [1993 Cal.P.U.C. Lexis 737, 4–5].)

Based on the foregoing principles, we conclude that Pipeline Company must clearly establish the unreasonableness of the Commission's method for valuing line fill. In addition, the Commission may depart from any prior method used to value line fill so long as the circumstances of this case justify that departure.

D.      Approaches to Line Fill

1.      *Court Cases Involving Line Pack or Cushion Gas*

One place to look for how to account for and determine the value of line fill is case law.  Many of the cases addressing how to account for line fill, line pack or cushion gas used in pipelines or reservoirs are tax cases.  (E.g., *Washington Energy Co. v. U.S.* (Fed. Cir. 1996) 94 F.3d 1557 [depreciation of cushion gas in reservoir]; *Pacific Enterprise & Subsidiaries v. Commissioner* (1993) 101 T.C. 1, 17 ["cushion gas and line pack gas are capital assets and not inventory"].)

In *Transwestern Pipeline Co. v. United States* (Ct. Cl. 1980) 639 F.2d 679 (*Transwestern*), the court addressed whether the line pack gas in the taxpayer's natural gas pipeline was a depreciable capital asset or constituted an inventory of merchandise held for sale in the normal course of business.  (*Id*. at p. 680.)  The court determined that (1) the line pack gas was an essential component necessary for the operation of the pipeline, (2) a vast majority of the line pack gas would be lost on abandonment of the

29.

transmission system,[8] and (3) the line pack gas met the definition of a fixed asset under generally accepted accounting principles, under industry standards, and the system of accounting used by the Federal Power Commission.[9] (*Transwestern*, *supra*, at pp. 680–681.) Based on these determinations, the court concluded the line pack gas should be treated for income tax purposes as a capital expenditure depreciable over the useful life of the pipeline system. (*Id*. at p. 681.)

In *Arkla, Inc. v. United States* (5th Cir. 1985) 765 F.2d 487, the court addressed the allowance of depreciation for cushion gas—that is, the volume of gas maintained in a reservoir to achieve an efficient pressure. (*Id*. at p. 488.) The court recognized that (1) some cushion gas was recoverable because it could be removed and sold when the reservoir was no longer used as a storage facility and (2) other cushion gas could not be recovered. (*Ibid*.) The court concluded the recoverable cushion gas was not subject to depreciation. (*Id*. at pp. 489–490.) In contrast, the court treated the nonrecoverable portion of the cushion gas as a capital asset subject to depreciation based on the useful life of the storage facility. (*Id*. at p. 490.)

### 2. *Federal Regulations*

In at least one context, federal regulations refer to line fill as inventory. Those regulations address how to calculate the royalty payments due under federal oil leases and allow the lessee to deduct certain reasonable, actual costs incurred to transport the oil before calculating the royalty owed. (30 C.F.R. §§ 1206.110 & 1206.111; see 30 C.F.R.

---

[8] According to the trial court's decision, which the appellate court adopted, "line pack, as a minimum volume of gas which must always be maintained in Transwestern's pipeline system if it is to operate, and which will not be recoverable to any substantial extent at the end of the system's useful life, can scarcely be regarded as inventory or as property held primarily for sale to customers." (*Transwestern*, *supra*, 639 F.2d at p. 685.)

[9] The Federal Power Commission was the federal agency that regulated the taxpayer, an interstate pipeline company, and its rates. In 1977, the Federal Power Commission was reorganized and renamed the Federal Energy Regulatory Commission (FERC). (*Simmons v. Sabine River Authority Louisiana* (5th Cir. 2013) 732 F.3d 469, 471, fn. 1.)

§ 1206.100, subd. (a).) One of the allowed deductions is "[t]he cost of carrying on your books as inventory a volume of oil that the pipeline operator requires you to maintain, and that you do maintain, in the line as line fill." (30 C.F.R. § 1206.110, subd. (b)(4).) The cost attributed to line fill is calculated by multiplying the value of the volume of line fill maintained for the month in question by the monthly rate of return specified by the regulations. (*Ibid.*; see 30 C.F.R. § 1206.111, subd. (b)(6)(ii) [calculating cost of pipeline transportation provided by the lessee or an affiliate].)

Another set of federal regulations are those promulgated by FERC to address its approval of rates for oil pipelines based on a cost-of-service methodology. (See 18 C.F.R. §§ 346.1-346.3 [oil pipeline cost-of-service filing requirements].) FERC requires the inclusion of a "Statement E—rate base" in the rate filings of oil pipelines. (18 C.F.R. § 346.2(c)(5).) One item required in this statement of the rate base is "working capital (including materials and supplies, prepayments, and oil inventory)." (*Ibid.*) The regulation does not use the terms "line fill" or "line pack" and, therefore, does not specify whether line fill is part of oil inventory. Nonetheless, Pipeline Company relies on this regulation to support its argument that line fill should be characterized as oil inventory.

E.     Commission's Analysis of Its Earlier Decision

A major argument by Pipeline Company is that an earlier decision by the Commission establishes that line fill is treated as working capital and not as a physical pipeline asset for purposes of ratemaking.

In *Pacific Gas and Electric Company* (1994) 53 Cal.P.U.C.2d 215 [1994 Cal.P.U.C. Lexis 82] (*PG&E*), the Commission considered and granted an application to increase the cost cap for a gas pipeline expansion from $736 million to $849 million. The Commission addressed the line pack associated with the pipeline by stating, "Line Pack is rate base item, and is, therefore, removed from plant-in-service total and included in rate base calculations." In Appendix B to the decision, the Commission identified

31.

"Working Cash Capital" as an element of the rate base and included three line items under that heading: (1) "Material and Supplies," (2) "Line Pack" and (3) "Working Cash Requirement." The value of the line pack included in the rate base for 1994 and for 1995 was $1,958,000 for each year. (*Id.* at pp. 116–118.)

We conclude *PG&E* does not control how the oil used as line fill must be valued for purposes of ratemaking and reparations in this case.

First, assuming that *PG&E* created binding precedent for the proper accounting of line pack, it would not necessarily apply in this case because Pipeline Company has not established that line pack in a gas pipeline is so similar to line fill in an oil pipeline that it is unreasonable to treat them differently. One possible distinction relates to timing. The term "line fill" suggests oil that is used prior to the initiation of deliveries to fill the pipeline and make it operational, while the term "line pack" might refer to oil used after the initial line fill has been replaced.[10] Pipeline Company's failure to demonstrate that the term "line pack" was used in the 1994 decision in the same manner as the term "line fill" is used in this case undercuts its argument that the 1994 decision dealt with the same thing.

Second, even if we assume line pack and line fill are the same thing in the context of an oil pipeline, *PG&E* is not authority for the proposition that the valuation of line fill *varies with current oil prices*. In *PG&E*, the value assigned to the line pack was the same for 1994 and 1995, which implies there was no monthly or periodic revaluation. Thus,

---

**10**     For example, it is possible for a utility company operating a pipeline to (1) provide the initial line fill, (2) subsequently enter into an arrangement where its customers provide and thus own the line pack that replaces the initial line fill, and (3) later replace the customer's oil with line pack oil owned by the utility company. This last step is illustrated by *Western Refining Southwest, Inc. v. F.E.R.C.* (2011) 636 F.3d 719, a case in which the pipeline operator removed the customer's line fill by pumping it into a storage tank, reversed the line flow and used the pipeline's capacity for its own benefit. In our example, the cost of line fill would be the original expenditure and the cost of the line pack would be incurred sometime after the pipeline became operational.

we are not convinced by Pipeline Company's position that the "Commission's use of original-cost valuation here cannot be squared with *PG&E*'s approach."

Third, and most importantly, Pipeline Company has not clearly demonstrated that the Commission acted unreasonably in the circumstances of this case by accounting for line fill as a fixed asset valued at its original cost. Pipeline Company has not acknowledged that applicable law requires it to clearly demonstrate the unreasonableness of the Commission's method for valuing line fill. Consequently, we will consider the points raised by Pipeline Company as though phrased in terms of that legal standard.

### 1. Physical Molecules

One argument presented by Pipeline Company is based on the physical molecules that constitute the line fill. The Commission took the position that the physical molecules constituting the line fill were not a decisive factor, stating that for ratemaking purposes "the line fill—not the physical molecules, just the investor investment—is kept at the original cost." This position is not clearly unreasonable because line fill is still in the pipeline after the delivery of a particular contract, even though the molecules in the pipeline have changed.

It appears that referring to the molecules might be one reasonable way to account for an asset, but it is not the only reasonable approach. For example, the molecules of cushion gas in a natural gas reservoir change, but it does not follow that cushion gas must be valued under a first-in-first-out method of accounting. (See *Pacific Enterprise & Subsidiaries v. Commissioner*, *supra*, 101 T.C. at p. 17 ["cushion gas and line pack gas are capital assets and not inventory"].) In *Transwestern*, *supra*, 639 F.2d 679, the court rejected the argument that line pack gas constituted inventory even though the molecules in the pipeline at any given moment were destined for delivery to customers. (*Id*. at pp. 686–687.) The court concluded that consideration of the "specific molecules of natural gas" reaching the customers was less important than the facts that the line pack

33.

remained constant and was necessary for the operation of the pipeline. (*Id*. at pp. 686–687.) Both of these factors apply to the SJV Pipeline.

Therefore, we conclude Pipeline Company's contention that the physical molecules of the line fill *must* control how line fill is valued has not been established and, therefore, Pipeline Company has not demonstrated the Commission's treatment of the line fill was clearly unreasonable.

### 2. *Federal Regulations*

Pipeline Company also argues there is no merit to the Commission's grounds for distinguishing the federal regulations defining "working capital" in the context of oil pipelines. (See 18 C.F.R. § 346.2, subd. (c)(5) [working capital includes oil inventory].)

This argument does not establish the Commission's valuation of line fill was clearly unreasonable because FERC regulations are not binding on the Commission for purposes of determining whether the Commission "has not proceeded in the manner required by law." (§ 1757, subd. (a)(2); see *SFPP, L.P. v. Public Utilities Com.*, *supra*, 217 Cal.App.4th 797–798.) As previously noted, there are different ways to account for line fill and line pack and the federal regulations do not establish the only reasonable approach.[11]

### F. Van Hoecke's Approach to Working Capital

#### 1. *Van Hoecke's Testimony and Exhibits*

Robert Van Hoecke is a principal of Regulatory Economics Group, LLC, a firm located in Virginia and specializing in economic, financial and regulatory consulting for the pipeline industry. Pipeline Company presented Van Hoecke's testimony to support its application for approval of tariffs for the SJV Pipeline.

---

[11]   In light of this conclusion, we do not reach the question whether the reference to "oil inventory" in the federal regulation includes line fill. (18 C.F.R. §346.2, subd. (c)(5).)

Van Hoecke's written testimony and the schedules he prepared addressed topics such as (1) cost of service, (2) rates per route, (3) operating expenses, (4) rate base, and (5) return on rate base. In this case, we are concerned with his approach to the *rate base*, which he calculated by adding *net property* to *working capital* and subtracting *accumulated deferred income taxes*. Van Hoecke assigned $86,000 to working capital, which his April 2009 written testimony explained as follows:

> "Working capital constitutes another element of rate base. Mr. Rathermel has provided the balance for this item which reflects various stock items includable in 'Materials and Supplies' such as power supplies and communication modules. I have assumed that 2010 working capital will be the same as that reflected in 2008."[12] (Fn. omitted.)

Schedule 4 to Van Hoecke's April 2009 written testimony identified the source of the working capital number as "Workpaper 1, Line 11." In turn, that workpaper listed the source of the working capital number as "Exhibit No. __ (HJR-1), Page 17." Exhibit No. __ (HJR-1) is not among the supporting documents provided with Pipeline Company's writ petition, but portions of that document are included in the administrative record as an attachment to the direct testimony of Rathermel. The attachment includes schedules 1 through 10, but does not include page 17 or the other workpapers.

Van Hoecke's February 2010 written testimony was submitted with schedules containing similar descriptions of the source of the working capital figure.

### 2. Commission's Use of Van Hoecke's Evidence

The Commission referred to Van Hoecke's use of $86,000 as working capital when it addressed Pipeline Company's argument that line fill was inventory and therefore

---

[12] Van Hoecke refers to 2010 because he chose it as the test year, developed projections for that year, and used those projections in his proposal regarding the tariff. Van Hoecke's mention of Mr. Rathermel refers to Harry "Kent" J. Rathermel, who was Senior Finance Advisor— Western Region Distribution for Shell Pipeline Company LP when he presented testimony to the Commission in April 2009 and February 2010. Rathermel testified about the operating expenses associated with the SJV Pipeline for 2008 and the 2010 test year.

working capital that must be valued on a present basis (not original cost). One reason the Commission was not convinced by Pipeline Company's argument was Van Hoecke's approach to working capital. In Decision 14-06-052, the Commission stated that Pipeline Company's argument contradicted its own witness, "Van Hoecke, who originally proposed a working capital amount of $86,000. [Citation.] He did not include oil inventory in his working capital number."

The Commission's finding that Van Hoecke's $86,000 figure for working capital did not include oil inventory probably was inferred from (1) Van Hoecke's testimony that the working capital balance he used included materials and supplies and the absence of any mention of oil inventory and (2) the fact that the $86,000 figure was too small to include oil inventory or line fill. The amount was too small because Matthew Petersen, another of Pipeline Company's witnesses, presented calculations that listed the volume of working inventory at approximately 1.17 million barrels[13] and estimated the value of that inventory as ranging from $64.8 to $120.2 million for the years 2006 through 2011. In contrast, the evidence presented by Matthew O'Loughlin, one of the shippers' witnesses, calculated the value of the line fill at approximately $20.6 million, using a volume of 1.5 million barrels and a 1996 crude oil price of $13.75 per barrel.

### 3. *Pipeline Company's Argument*

Pipeline Company challenges the Commission's treatment of Van Hoecke's testimony by arguing:

> "The working capital line item that Mr. Van Hoecke submitted in his original and rebuttal testimony was $86,000. (App-I 248; App-II 392.) An examination of the substance of Mr. Van Hoecke's testimony, however, reveals no explanation as to what items were or were not included in his working capital calculations. The Commission cannot simply infer that, presumably because the $86,000 figure seems in the Commission's

---

**13** Petersen's Schedule 8 broke this figure into 865,311 barrels of San Joaquin Valley heavy crude and 299,774 barrels of San Joaquin Valley light crude.

36.

estimation to be too low to include oil inventory, line fill was not included. [¶] … The claim that [Pipeline Company's] own witness categorically did not include oil inventory in his working capital calculations is not supported by any evidence in the record, and cannot be used as a fact that undermines [Pipeline Company's] position on line fill valuation."

Pipeline Company's argument is based on (1) a representation about what was and was not included in the record and (2) a challenge to the Commission's use of an inference in its role as the trier of fact. We consider each point separately.

### 4. *Explanation in the Record*

Counsel for Pipeline Company asserts that Van Hoecke's testimony reveals "no explanation as to what items were or were not included in his working capital calculations." This statement about the contents of the record is not accurate. (See Bus. & Prof. Code, § 6068, subd. (d).)

First, Van Hoecke testified that the working capital figure he used reflected various stock items includable in materials and supplies, such as power supplies and communication modules. Second, Van Hoecke explained the source of the working capital figure as being provided by Rathermel. Therefore, Pipeline Company's assertion that he provided no explanation of what was included in the working capital figure is manifestly false. Van Hoecke explicitly identified materials and supplies as being part of working capital and provided examples of items within that category. He also named Rathermel as the source of the working capital figure.

In addition, the schedules submitted with Van Hoecke's written testimony refer to an "Exhibit No. __ (HJR-1), Page 17" as the source of the working capital figure. This page was not included in the appendix filed by Pipeline Company to support its petition and is not part of the administrative record. Its omission cannot be used by Pipeline Company to its own advantage. The decision of the Commission is presumed correct and a petitioner has the burden of overcoming that presumption. (See *Pacific Gas & Electric Co. v. Public Utilities Com.* (2015) 237 Cal.App.4th 812, 838 [presumption of

37.

correctness extends to Commission's factual determinations].) A petitioner cannot carry that burden by omitting evidence and then pointing to the absence of that evidence to support its claim that the Commission misinterpreted the testimony presented. (Cf. *Ballard v. Uribe* (1986) 41 Cal.3d 564, 574 [appellate record was inadequate to demonstrate reversible error regarding damages because plaintiff failed to include transcript of relevant testimony].)

### 5. *Commission's Authority to Draw Inferences*

Counsel for Pipeline Company contends that the Commission could not infer the $86,000 figure for working capital did not include oil inventory. This contention, unsupported by a citation to authority, directly contradicts established principles of law relating to the Commission's ability to draw inferences when evaluating and weighing the evidence.

In our role as a court of review, we may not hold a trial de novo, take additional evidence or exercise independent judgment on the evidence. (§ 1757, subd. (b).) Instead, we determine whether "[t]he findings in the decision of the commission are not supported by substantial evidence in light of the whole record." (§ 1757, subd. (a)(4).)

The Supreme Court has held that findings of fact by the Commission have sufficient evidentiary support "if they are supported by any reasonable construction of the evidence." (*Toward Utility Rate Normalization v. Public Utilities Com.* (1978) 22 Cal.3d 529, 537; *Clean Energy Fuels Corp. v. Public Utilities Com.*, *supra*, 227 Cal.App.4th at p. 649.) Courts have recognized that an evaluation of the evidence by the Commission in its role as trier of fact often requires it to choose among conflicting inferences. "'When conflicting evidence is presented from which conflicting inferences can be drawn, the commission's findings are final.' [Citation.]" (*Toward Utility Rate Normalization v. Public Util. Com.*, *supra*, at p. 538.) The same rule applies when conflicting inference

38.

reasonably may be drawn from undisputed evidence. (*Pacific Tel. & Tel. Co. v. Public Util. Com.*, *supra*, 62 Cal.2d at p. 647.)

Under these principles governing the Commission's use of inferences, we must reject Pipeline Company's argument that the Commission could not infer the $86,000 figure for working capital did not include oil inventory. The inference was reasonable based on the testimony of Petersen and O'Loughlin about the amount and value of the oil constituting line fill. In short, the Commission's interpretation of Van Hoecke's testimony and the related exhibits passes muster under the substantial evidence standard of review. (§ 1757, subd. (a)(4).) Therefore, Pipeline Company has not demonstrated the Commission's evaluation of Van Hoecke's testimony contains factual error.

### G. Profits on Line Fill

#### 1. Findings

Decision 13-05-017 found that Pipeline Company profited from the sale of the line fill at market rates when the shippers began to provide the line fill, stating: "Under [Pipeline Company's] own calculations, it sold its existing line fill on July 1, 2011 for over $100 million. [Pipeline Company] is not entitled to profit from this sale again, and as it provides no legal or factual support for its position, we reject it."

#### 2. Contentions

Pipeline Company contends that the record provides no support for the Commission's finding that it realized a $100 million profit on the line fill.

The Commission argues that its finding is supported by substantial evidence about the value of the line fill in 1996 and the value of the line fill in 2011, from which it could deduce the amount of profit by comparing the two figures. Alternatively, the Commission argues the amount of profit is irrelevant because "none of that profit was required to be refunded to Shippers" and its statement about profits did not alter the refund calculation.

39.

*3.      Analysis*

We conclude that the Commission's other findings support its refund decision for purposes of section 1757, subdivision (a)(3) and its finding regarding profits derived from the 2011 sale of the line fill was not a factor used in determining the refund amount. Our conclusion that the finding about profit was irrelevant is based on the fact that the finding was not essential to the Commission's determination that the line fill was best regarded as a fixed asset to be valued at 1996 prices. In other words, the Commission would have treated the line fill as a fixed asset for purposes of determining its value even if the price of oil in July 2011 had plummeted to $13.75 per barrel and there was no difference between the original cost of the line fill and the price for which it was sold.

We recognize that Pipeline Company was in a position where it had to challenge the finding in this writ proceeding because, if Pipeline Company had prevailed on its other arguments, the finding about profit might have been offered as an *alternative* basis for upholding the Commission's decision.

## DISPOSITION

The petition for a writ is denied. Respondent and real parties in interest shall recover their costs in this proceeding. (Cal. Rules of Court, rule 8.493(a)(1)(A).)


_____

KANE, J.

WE CONCUR:


_____

HILL, P.J.


_____

SMITH, J.

40.